Case No. 23-14191-G

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

MONARCH AIR GROUP, LLC, and DAVID GITMAN,

Appellant,

vs.

JPMORGAN CHASE BANK, N.A.,

Appellees.

---

Appeal from the United States District Court
For the Southern District of Florida

Case No.: 0:21-cv-62429-WPD

---

## APPENDIX TO APPELLANTS' INITIAL BRIEF
## VOLUME 2 OF 7

---

**STOK KON + BRAVERMAN**
1 E. Broward Boulevard
Suite 915
Fort Lauderdale, FL 33301
P.954.237.1777
F.954.237.1737
E-mail: service@stoklaw.com

*Counsel for Appellants
Monarch Air Group LLC and
David Gitman*

# <u>INDEX OF APPENDIX</u>

**Docket/Tab #**

## <u>Volume 1</u>

District Court Docket Sheet……………………………………..…..A

Notice of Removal……………………………………………………..1

Notice of Removal Exhibit A: State Court Complaint…………..……..1-1

Amended Notice of Removal……………………………….........................5

Amended Complaint for Damages and Injunctive Relief………...……..21

Defendant's Answer and Affirmative Defenses to Amended Complaint……………………………………………………… 25

Second Amended Complaint…………………………………………..…78

Defendant's Answer and Affirmative Defenses to Second Amended Complaint……………………………………………………..85

Plaintiffs Evidentiary Material in Support of Motion for Summary Judgment (Filed Under Seal)……………………………………………86

Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment………………………………88

Plaintiffs' Motion for Partial Summary Judgment………………..........89

Defendant's Motion for Summary Judgment (Unredacted Version Filed Under Seal)…………..……………….......90

Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (Unredacted Version Filed Under Seal)..……………………………………………………….91

STOK KON + BRAVERMAN

1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

Defendant's Statement of Undisputed Material Facts
Exhibit 1: A. Lauro Depo Transcript (Filed Under Seal)……..…….91-1

Defendant's Statement of Undisputed Material Facts
Exhibit 2: Deposit Account Agreement (Filed Under Seal)…………91-2

Defendant's Statement of Undisputed Material Facts
Exhibit 3: D. Gitman Depo Transcript (Filed Under Seal)…………91.3

Defendant's Statement of Undisputed Material Facts
Exhibit 4: The Stern Facts Article……………………………………...91-4

Defendant's Statement of Undisputed Material Facts
Exhibit 5: Flight of the Monarch…..………………………………….91-5

## Volume 2

Defendant's Statement of Undisputed Material Facts
Exhibit 6: Defendant's Supplemental Answers to Interrogatories
(Filed Under Seal)…………………………………………..……………91-6

Defendant's Statement of Undisputed Material Facts
Exhibit 7: Declaration of A. Lauro (Filed Under Seal)……………...91-7

Defendant's Statement of Undisputed Material Facts
Exhibits 8-67: Messages (Filed Under Seal)……………..……91-8 91-67

Defendant's Statement of Undisputed Material Facts
Exhibit 68: E-mail…………………………………………………….91-68

Defendant's Statement of Undisputed Material Facts
Exhibit 69: Depo Notice…………………………………………….....91-69

Defendant's Statement of Undisputed Material Facts Exhibit 70:
Plaintiffs' Response to Interrogatories (Filed Under Seal)………...91-70

Plaintiffs Amended Motion for Partial Summary Judgment..……....105

Plaintiffs' Amended Statement of Undisputed Material Facts
in Support of Motion for Partial Summary Judgment...................106

Plaintiffs' Response in Opposition to Defendant's
Motion for Summary Judgment.................................................108

Plaintiffs' Response in Opposition to Defendant's Statement of
Undisputed Material Facts in Support of Motion for Summary
Judgment.............................................................................109

Order Striking Plaintiffs Amended Motion for Partial Summary
Judgment/Amended Statement of Undisputed Material Facts........110

Plaintiffs' Motion for Sanctions...............................................115

Plaintiffs' Motion for Sanctions Exhibit A:
Plaintiffs' First Request for Production...................................115-1

## Volume 3

Plaintiffs' Motion for Sanctions Exhibit B:
Deposition Transcript of Michael Biratsis...............................115-2

Plaintiffs' Motion for Sanctions Exhibit C:
February 23, 2023 Email from Mr. Weinberg.........................115-3

Plaintiffs' Second Amended Motion for Partial Summary
Judgment.............................................................................119

Plaintiffs' Second Amended Statement of Undisputed Material
Facts in Support of Motion for Summary Judgment....................120

Order Striking Plaintiffs' Second Amended Motion for Partial
Summary Judgment...............................................................121


Defendant's Motion to Strike Plaintiff's Motion for Sanctions or
Alternatively Unopposed Motion to Extend Page Limit

for Defendant's Response…………………………………………122

Plaintiffs' Motion for Reconsideration of Order Striking Plaintiffs'
Motion for Summary Judgement and Statement of
Material Facts……………………………………………..…..126

Order Denying Plaintiffs' Motion for Reconsideration………………130

## Volume 4

Defendant's Reply in Support of its Motion for Summary
Judgment……………………………………………………131

Defendant's Response to Plaintiff's Motion for
Sanctions……………………………………………………136

Plaintiff's Reply in Support of Plaintiffs' Motion for Sanctions…….146

Defendant's Motion to Strike Plaintiff's Reply in Support of
Plaintiff's Motion for Sanctions…………………………………....147

Plaintiffs' Reply in Support of Plaintiff's Motion for Sanctions…….153

Plaintiffs' Reply in Support of Plaintiff's Motion for Sanctions
Exhibit A: Organizational Chart………………………………...153-1

Plaintiffs' Reply in Support of Plaintiff's Motion for Sanctions
Exhibit B: Notice of Taking Deposition……………………………153-2

Plaintiffs' Notice of Supplemental Authority In Opposition to
Chase's Motion for Summary Judgment…………………………154

Plaintiffs' Notice of Supplemental Authority In Opposition to Chase's
Motion for Summary Judgment Exhibit A: *Sutton v. Wal-Mart Stores
East, LP*, 22-10162 (11th Cir. Mar. 31,2023)…………………..…154-1

Plaintiffs' Second Motion for Sanctions………………………..………170

Paperless Order on DE 115 Plaintiffs' Motion for Sanctions...........175

Defendant's Response to Plaintiffs' Second Motion for Sanctions....191

Plaintiffs' Reply to Response To Second Motion for Sanctions.….....198

Paperless Order on DE 170 Second Motion for Sanctions and
DE 181 Motion in Limine...........................................................203

Order Granting Defendant's Motion for Summary Judgment.….......205

Final Judgment and Order Closing Case...................................206

Transcript of Hearing on DE 170 Motion for Sanctions and
DE 181 Motion in Limine......................................…...…....210

## Volume 5

Plaintiffs' Motion for Relief from Judgment...............................…...212

Plaintiffs' Motion for Discovery to Support Their Motion for
Relief from Judgment..............................................................…...213

Appendix To Plaintiffs' Motion For Relief From Judgment
(Filed Under Seal)...............................................................…...217

Defendant's Response to Plaintiffs Motion for Discovery to Support
Their Motion for Relief from Judgment (Unredacted Version Filed
Under Seal)..................…...................................................................226

Defendant's Response to Plaintiffs Motion for Discovery to Support
Their Motion for Relief from Judgment Exhibit A: Subpoena
(Filed Under Seal)......................................................…........226-1

Defendant's Response to Plaintiffs Motion for Discovery to Support
Their Motion for Relief from Judgment Exhibit B: SSU Procedure
Document (Filed Under Seal)...................................….………........226-2

Defendant's Response to Plaintiffs Motion for Discovery to Support
Their Motion for Relief from Judgment Exhibit C: T. Pittman Depo
Transcript (Filed Under Seal)……………………………….…….......226-3

Plaintiffs' Reply In Support of Motion for Discovery to Support
Their Motion for Relief From Judgment………………………….....230

Paperless Order on DE 213 Plaintiffs' Motion for Discovery…...…….240

## Volume 6

Transcript Of Evidentiary Hearing held on July 20, 2023………..253-1

## Volume 7

Transcript Of Evidentiary Hearing (Continued) held on
July 21, 2023……………………………………………………....253-2

Plaintiffs' Objection to Magistrate Judge Valles Order On
Plaintiffs' Motion For Discovery……………………………..…….261

Defendant's Response to Plaintiffs' Motion for Relief from Judgment
(Unredacted Version Filed Under Seal)……………………………...263

Defendant's Response to Plaintiffs' Motion for Relief from Judgment
Exhibit A: Partially Unredacted AML Interdiction List Request
(Filed Under Seal)………………………………………....………..263-1

Defendant's Response to Plaintiffs' Motion for Relief from Judgment
Exhibit B: Notice of Taking Deposition Duces Tecum (Filed Under
Seal)………………………………………………………………263-2

Plaintiffs Reply in Support of Their Motion for Relief
from Judgment……………………………………………………,..,..268

Defendant's Response to Plaintiffs Objections to Order on Plaintiffs
Motion for Discovery to Support their Motion (Unredacted Version
Filed Under Seal)……………………………………….…………...…270

Order Adopting and Affirming DE 240 Magistrate Judge's
Order Denying Motion for Discovery……………………….…….....…276

Order Denying DE 212 Plaintiffs' Motion for Relief
From Judgment…………………………………………………...…..277

Certificate of Service

STOK KON + BRAVERMAN
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

# TAB 91-6

# EXHIBIT 6
# (Filed Under Seal)

**TAB 91-7**

# EXHIBIT 7
# (Filed Under Seal)

TAB 91-8

# EXHIBIT 8
# (Filed Under Seal)

# TAB 91-9

# EXHIBIT 9
# (Filed Under Seal)

# TAB 91-10

# EXHIBIT 10
# (Filed Under Seal)

# TAB 91-11

# EXHIBIT 11
# (Filed Under Seal)

# TAB 91-12

# EXHIBIT 12
# (Filed Under Seal)

# TAB 91-13

# EXHIBIT 13
# (Filed Under Seal)

TAB 91-14

# EXHIBIT 14
# (Filed Under Seal)

# TAB 91-15

# EXHIBIT 15
# (Filed Under Seal)

# TAB 91-16

# EXHIBIT 16
# (Filed Under Seal)

# TAB 91-17

# EXHIBIT 17
# (Filed Under Seal)

TAB 91-18

# EXHIBIT 18
# (Filed Under Seal)

# TAB 91-19

EXHIBIT 19
(Filed Under Seal)

**TAB 91-20**

# EXHIBIT 20
# (Filed Under Seal)

# TAB 91-21

# EXHIBIT 21
# (Filed Under Seal)

# TAB 91-22

# EXHIBIT 22
# (Filed Under Seal)

**TAB 91-23**

# EXHIBIT 23
# (Filed Under Seal)

# TAB 91-24

# EXHIBIT 24
# (Filed Under Seal)

# TAB 91-25

# EXHIBIT 25
# (Filed Under Seal)

TAB 91-26

# EXHIBIT 26
# (Filed Under Seal)

# TAB 91-27

# EXHIBIT 27

**TAB 91-28**

# EXHIBIT 28
# (Filed Under Seal)

# TAB 91-29

# EXHIBIT 29
# (Filed Under Seal)

# TAB 91-30

# EXHIBIT 30
# (Filed Under Seal)

# TAB 91-31

EXHIBIT 31
(Filed Under Seal)

# TAB 91-32

# EXHIBIT 32
# (Filed Under Seal)

# TAB 91-33

# EXHIBIT 33
# (Filed Under Seal)

**TAB 91-34**

EXHIBIT 34
(Filed Under Seal)

# TAB 91-35

# EXHIBIT 35
# (Filed Under Seal)

# TAB 91-36

EXHIBIT 36
(Filed Under Seal)

TAB 91-37

EXHIBIT 37
(Filed Under Seal)

# TAB 91-38

# EXHIBIT 38
# (Filed Under Seal)

# TAB 91-39

EXHIBIT 39
(Filed Under Seal)

# TAB 91-40

# EXHIBIT 40
# (Filed Under Seal)

# TAB 91-41

EXHIBIT 41
(Filed Under Seal)

# TAB 91-42

# EXHIBIT 42
# (Filed Under Seal)

# TAB 91-43

EXHIBIT 43
(Filed Under Seal)

# TAB 91-44

# EXHIBIT 44
# (Filed Under Seal)

# TAB 91-45

# EXHIBIT 45
# (Filed Under Seal)

**TAB 91-46**

# EXHIBIT 46
# (Filed Under Seal)

# TAB 91-47

EXHIBIT 47
(Filed Under Seal)

TAB 91-48

# EXHIBIT 48
# (Filed Under Seal)

TAB 91-49

# EXHIBIT 49
# (Filed Under Seal)

# TAB 91-50

# EXHIBIT 50
# (Filed Under Seal)

**TAB 91-51**

EXHIBIT 51
(Filed Under Seal)

**TAB 91-52**

# EXHIBIT 52
# (Filed Under Seal)

TAB 91-53

# EXHIBIT 53
# (Filed Under Seal)

TAB 91-54

# EXHIBIT 54
# (Filed Under Seal)

# TAB 91-55

# EXHIBIT 55
# (Filed Under Seal)

**TAB 91-56**

EXHIBIT 56
(Filed Under Seal)

# TAB 91-57

# EXHIBIT 57
# (Filed Under Seal)

# TAB 91-58

# EXHIBIT 58
# (Filed Under Seal)

# TAB 91-59

# EXHIBIT 59
# (Filed Under Seal)

# TAB 91-60

# EXHIBIT 60
# (Filed Under Seal)

TAB 91-61

# EXHIBIT 61
# (Filed Under Seal)

**TAB 91-62**

# EXHIBIT 62
# (Filed Under Seal)

# TAB 91-63

# EXHIBIT 63
# (Filed Under Seal)

# TAB 91-64

# EXHIBIT 64
# (Filed Under Seal)

# TAB 91-65

# EXHIBIT 65
# (Filed Under Seal)

# TAB 91-66

# EXHIBIT 66
# (Filed Under Seal)

# TAB 91-67

# EXHIBIT 67
# (Filed Under Seal)

# TAB 91-68

EXHIBIT 68
(Filed Under Seal)

# TAB 91-69

# EXHIBIT 69
# (Filed Under Seal)

# TAB 91-70

# EXHIBIT 70
# (Filed Under Seal)

# TAB 105

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC d/b/a                           CASE NO.: 21-cv-62429-WPD
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

      Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

      Defendant.

_____/

**PLAINTIFFS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs, Monarch Air Group, LLC d/b/a Mercury Jets, a Florida limited liability company and David Gitman, move, under Federal Rule of Civil Procedure 56, for partial summary judgment against Defendant, JPMorgan Chase Bank, N.A. on Counts I, II and III of their— Complaint.

## **INTRODUCTION**

In this case, Chase, an international bank, communicated defamatory statements about Plaintiffs, including that it could not complete wire transfers to Monarch "due to sanctions and/or Internal JPM Policy," *see e.g.* SUMF at ¶ 1, [DE 86-1], while knowing that Plaintiffs were not subject to any sanctions and communicating internally that the reason for the wire cancellations "w[as] not sanctions…," *see id.* at ¶ 2, [DE 86-2]. Chase only says that statement when it cancels transactions for non-sanctions reasons. *Id.* ¶ __. Chase did not just make these defamatory statements to the public at large, but worse, specifically to Plaintiffs' customers and vendors harming Plaintiffs' reputations, and causing substantial business losses, and additional costs to Plaintiffs incurred mitigating Plaintiffs' damage caused by Chase's wanton misconduct.

Chase knows that:

Sanctions are the economic arm of foreign policy used to influence countries or individuals violating international laws or human rights, engaging in unlawful activity such as narcotics trafficking, human trafficking or activity that poses a security threat to other nations through the development and proliferation of weapons of mass destruction, chemical and biological weapons or acts of terrorism.

In *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2209 (2021), the Supreme Court, agreeing with Chase, concluded that merely suggesting that someone was potentially subject to OFAC sanctions equated to defamation because that person's reputation was harmed by being labeled "as potential terrorists, drug traffickers, or serious criminals."

But rather than simply communicate that it would not transfer funds to or from Plaintiffs because of Chase's internal policy, Chase told over forty people or entities doing business with the Plaintiffs, Plaintiffs current bank, and many other banks that they could not complete wire transfers "due to sanctions."  Chase also told others that "sending money to Monarch is risky and indicates that Monarch is untrustworthy," a "wire [was] put on hold due to technical or money laundering suspicion," a "[w]ire could not be processed because [Monarch] dealt with an OFAC country at some point. Those are countries like North Korea, Syria, etc. that are on a US list of countries not to do business with," and "Monarch Air was flagged for having sanctions with the government."

Chase made all these false and defamatory statements knowing that they were absolutely false, because Chase knew that the Plaintiffs were not subject to sanctions or any other legal issues with them. Based on these many and undisputed defamatory statements, and the juxtaposition of statements implying a defamatory connection between them—all to the Plaintiffs' severe detriment—Plaintiffs are entitled to summary judgment on Count I (Defamation–Slander), Count II (Defamation–Libel), and Count III (Defamation by Implication) as a matter of law.

<u>ANALYSIS</u>

## I.      <u>Standard for Summary Judgment</u>

Summary judgment is appropriate when viewing the evidence in the light most favorable to the non-movant "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This burden may be met by "showing—that is, pointing out to the court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the moving party meets this burden, the nonmoving party must point to specific evidence in the record that establishes a genuine issue of material fact from which a reasonable jury could return a verdict in its favor. *See id.* at 323-34; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     <u>Plaintiffs' are entitled to summary judgment on Counts I and II for defamation</u>

"Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). "A statement is defamatory if it 'tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation.'" *Rapp*, 997 So.2d at 1109. *Sloan v. Shatner*, 8:17-CV-332-T-27AAS, 2018 WL 3769968, at \*4 (M.D. Fla. June 22, 2018).

The defamatory statement must "be construed as the common mind would naturally understand it." *See McCormick v. Miami Herald Pub. Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962). The defamatory statement must be "considered in its natural sense without forced or

strained construction." *Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). "A workable test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.*

A defamatory statement should not be given a tortured interpretation; instead, courts must construe the statement in the way the common mind and the reader to whom it was addressed would ordinarily understand it. *See Fortson v. Colangelo*, 434 F.Supp. 2d 1369, 1381-1382 (S.D. Fla. 2006).

> In determining the availability of a defamatory meaning for a given statement, a court considers the statement in the context of the publication as a whole and evaluates it as it would be understood by the common mind. A court must consider a publication in its totality, looking at all the words used, not merely a particular phrase or sentence. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.

*Folta v. New York Times Co.*, No. 1:17-cv-246-MW/GRJ, 2019 WL 1486776, at *10 (N.D. Fla. 2019) (cleaned up). "In assessing the status of potentially defamatory statements, a court 'must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication.'" *Id.* (internal citations omitted).

A. <u>Chase made defamatory statements directly to Plaintiffs' customers and vendors</u>

Starting in September 2020, Chase lied to Monarch's customers, vendors, and banks stating: Monarch is linked to the Office of Foreign Assets Control ("OFAC") sanction list and cannot process wire transfers due to "Sanctions and/or Internal JPMC Policy." *See* SUMF at ¶ 1, JPMC_1780-1902.[1] Chase only says that it cannot execute a transaction "due to Sanctions and/or Internal JPMC policy" when a transaction is cancelled for non-sanctions reasons. Still, the defamation continued even with Chase also admitting, both internally and in response to Monarch, that Monarch is not on any OFAC sanctions list and has never been the subject of any sanctions. *See id.* at ¶ 2, [DE 86-4] ("For risk reasons Chase decided to exit the relationship with Monarch. Our risk decision was not based on any name confusion or OFAC list."). Chase's Corporate Representative also stated that he had not seen any evidence that Monarch was on the OFAC list. *See id.*, [DE 86-5 at 49:24-25; 50:1-9].

Indeed, Chase's Senior Compliance Officer in Global Sanctions Compliance also confirmed that Monarch was not subject to sanctions when asked by another Chase employee why

---

[1]     The pin cite refers to the Bates Stamp number provided within Chase's document production.

a particular wire to a Monarch customer was cancelled and what they could respond to the client: "These were not sanctions alerts [redacted]. SUMF at ¶ 3, [DE 86-2]. Chase's corporate representative confirm this in his deposition, admitting that Plaintiffs "weren't subject to sanctions" and when asked what "possible sanction" Plaintiffs were subject to, Chase's testified: "[t]here wasn't one." *See id.*, [DE 86-5 at 44:2-20].

With how Chase's policies work, Chase always knew that Plaintiffs were not subject to any sanctions. *See* SUMF ¶ 4. As far back as February 2021, Chase also admitted to Monarch that it is not on any OFAC sanctions list and in June 2021, Chase internally confirmed that Monarch is not subject to any sanctions at all. Chase's employees were told to relay this undisputed information to Monarch's clients and vendors when questioned about the cancelled wire transactions. Yet, even since then, Chase continued to spread these false and monumentally damaging statements—that Monarch is subject to sanctions—directly to Monarch's customers and vendors in scores of documented instances. *See id.* at ¶ 1.

And to be sure, Chase acknowledges that cancelling a wire due to "JPMC Internal Policy" is distinct from being cancelled due to "sanctions." Meaning, Chase admits that businesses and individuals like the Plaintiffs will be on Chase's internal interdiction list, but not be subject to sanctions. *See id.* at ¶ 5, [DE 86-5 at 56:23-25;57:1-25;57:1-3]. Yet Chase's communications with Plaintiffs' customers and vendors still gratuitously tell them that Plaintiffs are subject to sanctions, Chase's internal policies, or both. Chase provided no rationale for why they include admittedly false information in these communications, other than Chase systematically commingles its sanctions compliance with its other internal policy compliance. *See* SUMF at ¶ 6, [DE 86-5 at 58:9-59:18]. And this is so even though every message that Chase has sent—to anyone, about anyone—that it could not "execute a transaction due to Sanctions and/or Internal JPMC Policy" was for a transaction cancelled for non-sanctions reasons. *See* SUMF at ¶ 4. There is no separate option to select only Chase's internal interdiction list as a reason, resulting in the standard "cancelled due to sanctions and/or internal JPMC policy" message to be sent out for non-sanction cancellations. *Id.* Even though Chase can remove the word "Sanctions," it does not. *See* SUMF at ¶ 8. What's more, both Chase interdiction-list- and sanction-concerns result in cancelled wires being placed in the same "OFAC queue," regardless of if the transaction involves sanctions. *Id.*, [DE 86-16 at 29:19-30:1;32:16-25].

B. The damaging effect of Chase's defamatory statements on Plaintiffs' reputation

As a customer or vendor, hearing that a company or person that you are doing business with also did business with OFAC countries "like North Korea, Syria, etc. that are on a US list of countries not to do business with"—and, worse, is subject to sanctions—raises immediate red flags that would make any reasonable person rethink working with that company for that transaction, if ever again at all. *Id.* at ¶ 7, [DE 86-6, at 4]. According to Chase, Sanctions are:

> the economic arm of foreign policy used to influence countries or individuals violating international laws or human rights, engaging in unlawful activity such as narcotics trafficking, human trafficking or activity that poses a security threat to other nations through the development and proliferation of weapons of mass destruction, chemical and biological weapons or acts of terrorism.

*See* SUMF at ¶ 2. The Supreme Court agrees. *TransUnion LLC*, 141 S.Ct. at 2209. On top of that, the effect of being told that your wire transfer was cancelled due to sanctions, by your own financial institution, the largest in the United States, magnifies the damaging effects exponentially.

Thus, these blatantly false statements communicated to Monarch's customers are defamatory *per se*. That is, statements that are "so obviously defamatory" and "damaging to reputation" that they "give[ ] rise to an absolute presumption both of malice and damage." *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)). Defamation is actionable *per se*, or without a showing of special damages, if it: (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession. *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1248 (S.D. Fla. 2014), *aff'd*, (Feb. 17, 2015). Chase telling Monarch's customers that Monarch was on or associated with the OFAC list and subject to sanctions subjected it to distrust and resulted in major injuries to the function of its business operations and reputation, all of which occurred here as a result of Chase's serious misconduct. *See, e.g.*, SUMF at ¶ 13.

Examples of Plaintiffs' customer's reactions are below. *See* SUMF at ¶ 7, [DE 86-6]:

> I am, however, a bit concerned that your company can not receive wire transfers from one of the largest financial institutions in the world after you told me that wire transfers are one of two ways to pay for this service. Chase has indicated that sending money to your company is considered "risky," which does not indicate that your services are incredibly trustworthy. Is there something you might provide to show me otherwise? I would really like to complete this transaction and have a guarantee that there will be a plane waiting to take me to and from New York.

*Id.*, [DE 86-6, at 7].

> I just tried to wire funds to your account and the bank said they could not wire to that account. Said it was flagged by their compliance department and [sic] they would not do business with Monarch Air Group. I bank with JP Morgan Private Bank. That can't be a good thing for your company as it's the largest bank in the US. Any insights here?

*Id.*, [DE 86-6, at 10].

> I don't understand why my Chase wires keep coming back. They say: We are unable to execute your transaction due to Sanctions and/or Internal JPMC Policy. This makes me nervous every time I see sanctions. My bank is telling me it's you guys. Please tell me everything is OK. I need to make sure that we are all set. I am used to being charged ahead of time – which is fine but I am concerned I am going to show up and [t]here will be no plane.

*Id.*, [DE 86-6, at 13].

> Can someone please tell me what sanctions mean? Is this business not good? I am booking flights with them.

SUMF at ¶ 13

The above examples show that Monarch's customers were immediately concerned and questioned Monarch's trustworthiness and reputation within the private flight industry upon receiving Chase's false communications. There is no genuine dispute that these statements about Monarch being subject to sanctions are false, were made with actual knowledge of their falsity, caused damages, and were defamatory. *See* SUMF at ¶ 3, [DE 86-7] ("At this time, payments intended for this entity will continue to be canceled per JPMC Policy. **This was not a sanctions concern** but alerted against an [redacted] interdiction record.") (emphasis added). *See also id.*, [DE 86-8] ("JPMC has a risk based processes in place to determine whether or not it will process transactions. For business and commercial reasons, JPMC has determined that it will not process payments to or from Monarch Air Group in Ft Lauderdale Fl. This decision is supported by standard industry practices. No other information can be provided to the client. **These were not sanctions** [redacted]") (emphasis added).

Chase could have communicated non-defamatory statements to Monarch's customers: communications that did not mention sanctions as a reason for the cancellation of wire transfers. Chase could have easily removed the word "sanctions" and informed Monarch's customers that their wires were canceled simply due to Chase's internal JPMC policy. *See id.* at ¶ 6 ("We are unable to execute your transaction due to Risk JPMC policy. We do not have any more details

regarding same."); SUMF at ¶ 8. Alternatively, Chase could have elaborated and included in the communications which portions of their internal policy were at issue and why Monarch was suspected of violating such policies. Still, Chase chose to intentionally spread false and harmful statements to Monarch's customers to Monarch's harm.

Eliminating the false portion—"due to sanctions"—of Chase's statement, "We are unable to execute your transaction due to sanctions and/or Internal JPMC policy," creates a very different effect than when it is included. *See McCormik*, 139 So. 2d at 200. Had Chase just communicated that transactions were cancelled due to "Internal JPMC Policy," as they did at least one time, the Plaintiffs would not be here and their reputations would not be harmed. By including the concededly false statement "sanctions," Chase defamed the Plaintiffs. So there is no genuine dispute as to any material fact and Plaintiffs are entitled to summary judgment on Counts I and II for defamation.

### III.   Plaintiffs' are entitled to summary judgment on Count III for Defamation By Implication

Whether statements are defamatory by implication is a question of law. *Turner*, 879 F.3d at 1269 (citing *Brown v. Tallahassee Democrat, Inc.*, 440 So. 2d 588, 590 (Fla. 1st DCA 1983). "The elements of defamation by implication are (1) a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (2) the creation of a defamatory implication by omitting facts." *Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016) (citing *Rapp*, 997 So. 2d at 1106). The inquiry turns on whether the "gist" of the statements is false. *Rapp*, 997 So. 2d at 1107-08. "[D]efamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Id.* at 1108.

Here, at best, Chase juxtaposed the false fact that Plaintiffs' customers' transactions were cancelled "due to sanctions," with a true statement that the transactions were cancelled due to "internal JPMC Policy." This confused Monarch's customers, who, as shown above, extremely worried about continuing their relationships with Monarch, and internally confused Chase when multiple employees saw the "Sanctions and/or Internal JPMC Policy" and continued to refer to Monarch's case as one involving sanctions without mention of internal policies. Chase's communication also caused Plaintiffs' current bank to think that Plaintiffs' were sanctioned when it asked Chase to "please urgently advise if this was reported to OFAC and under what sanctions." SUMF at ¶ 12. Chase maintains the nonsensical argument that the above line is fully accurate, complete and true despite including "sanctions" as the primary reason for cancelling wire

payments. Yet Chase thinks this is fine, even while knowing that Monarch is not subject to sanctions, only because Chase also includes "and/or JPMC Internal Policy" in the statement. *See* SUMF at ¶ 2, [DE 86-5 at 44:2-20]. Taken to its logical extreme, Chase still maintains its position, even agreeing with the statement that being a good guy and/or an axe murder is a true statement due to the use of "and/or," a position that would not come close to passing the laugh test let alone a reasonable juror standard. *See id.* at ¶ 1, [DE 86-5 at 71:22-25;72:1-17].

Yet, Chase admits that replacing "and/or" with "and" would lead to Chase making a false statement about Monarch, assuming the truth that Monarch is not subject to sanctions. SUMF at ¶ 9, [DE 86-5 at 46:19-25;47:1].

About the phrase "and/or," the Florida Supreme Court has stated "[i]t is one of those inexcusable barbarisms which was sired by indolence and dammed by indifference." *Cochrane v. Florida E. Coast Ry.*, 145 So. 217, 218-19 (Fla. 1932). The use of the phrase "and/or" creates an ambiguity in whether the author means the first option, the second option, or both. *Multitech Corp. v. St. Jons Bluff Inv. Corp*, 518 So. 2d 427, 431 (Fla. 1st DCA 1988); "and/or," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/and%2For (last accessed 12/15/2022) ("used as a function word to indicate that two words or expressions are to be taken together or individually").

> The use of Courts and commentators alike have remarked upon the confusion and ambiguity that often attends the use of the term "and/or." *See, e.g.*, *In re Seneca Falls Cent. Sch. Dist.*, 117 Misc.2d 879, 459 N.Y.S.2d 689, 693–94 (Sup. Ct. 1983) ("Long since abhorred by the Courts, the use of the term 'and/or' has been referred to as '**the abominable invention**' [and] '**as devoid of meaning as it is incapable of classification by the rules of grammar and syntax**.' " (citation omitted)); *see also United States v. Taylor*, 258 F.3d 815, 819 (8th Cir. 2001) (remarking, in context of "unfortunate use of the 'and/or' phrase," that "Strunk and White describe 'and/or' as a 'device, or shortcut, that damages a sentence and **often leads to confusion or ambiguity**" (quoting *William Strunk, Jr. & E.B. White*, The Elements of Style 40 (4th ed. 2000))); *Bryan A. Garner*, A Dictionary of Modern Legal Usage 56 (2d ed. 1995) ("[A]nd/or has been vilified for most of its life—and rightly so. The upshot is that the only safe rule to follow is not to use the expression in any legal writing, document, or proceeding, under any circumstances." (citation omitted)); *id.* at 57 (noting that sometimes "and/or" is used to mean "and" alone, sometimes is used to mean "or" alone, but, when used properly, should mean "x or y or both").

*Roc Nation LLC v. HCC Int'l Ins. Co., PLC*, 19 CIV. 554 (PAE), 2021 WL 827957 (S.D.N.Y. Mar. 4, 2021).

Here, Chase ignores that, at best, the statement "we are unable to execute your transaction due to Sanctions and/or Internal JPMC Policy," is ambiguous. Notwithstanding Chase's agreement and testimony that the transactions **were not** cancelled due to sanctions, Chase asserts that the statement "does [not] equate to a statement where **both alternatives are true**…." *Id.* at ¶ 8 [DE 86-9 at page 7]. Even so, Chase recognizes that the use of the and/or conjunctive could represent three distinct interpretations: (1) that Plaintiffs are subject to sanctions and internal JPM policy; (2) that Plaintiffs are subject to sanctions; or (3) that Plaintiffs are subject to internal policies of Chase. *See id.*, [DE 86-5 at 72:22-25;73:1-9]. Tara Pittman, Chase's advisor to the senior unit reviewing canceled wires also agrees that Chase's statement means that all three of the above options may apply to a cancelled transaction. *See* SUMF at ¶ 10, [DE 86-16 at 35:15-19;44:6-16].

But as the communications and testimony show, two out of those three interpretations are false statements—Monarch is not and has never faced sanctions according to Chase itself—rendering only one interpretation, that a wire was cancelled solely due to internal Chase policy, a true statement. By including the word sanctions along with Chase's internal policies as reasons for cancelled wire transactions, Chase has implied a defamatory connection between them so that Monarch looks to be doing illegal activity—sanctions. The defamatory implication is made stronger by Chase omitting that Monarch is not subject to sanctions—a fact it has been well aware of long before it started publishing these statements internally and to Monarch's customers and vendors.

A. Confusion within Chase due to Chase's defamatory statements and implications

Chase's testimony and communications produced by Chase show the defamatory implication created by Chase is so strong that Chase's employees believed it as well. Chase employees fixated on the "sanctions" language juxtaposed with Chase's internal policy language. Meaning, **even internally Chase understands that despite the communications saying "and/or," Chase's employees who are experienced and knowledgeable in their own flagging system for sanctions and internal policies thought that the transactions were cancelled due to sanctions, and not because of internal Chase policy.** *See* SUMF at ¶ 11, [DE 86-5 at 61:10-25; 62:1-12]; *see also id.*, [DE 86-10].

Furthermore, when a Chase employee asked a colleague to find out why a wire was flagged and cancelled due to compliance, the employee says, "I don't know what else I can tell them? This is the sanctions one." *See* SUMF at ¶ 9, [DE 86-11]; [DE 86-5 at 108:16-25;109:1-8].  Examples

abound; in fact, it does not appear that any Chase employee knew this was an internal policy to the exclusion of sanctions. *See id.*, [DE 86-5 at 120:3-15;121:5-12].

Chase's own "Client Messaging Guidelines for Sanctions," SUMF at ¶ 6, [DE 86-12], is a misnomer that easily lends itself to further Chase employee confusion. Only part of the policy involves guidance on sanctions, while other parts discuss cancelled wires for reasons like internal JPMC policy according to Chase's Corporate Representative.[2] The problem with Chase's answer that the above-referenced policy would only be confusing until it was eventually clarified, is that the clarification may never occur. The "confused party" is likely not aware of the confusion until another party intervenes to correct the error. Even more so with Monarch customers, who read that their wire was cancelled due to "Sanctions and/or Internal JPMC Policy" and would not follow up to learn that Monarch is not actually subject to sanctions, or simply chose not to after seeing such damning language. The defamatory implication has already been made, whether it be in the mind of a Monarch customer, or Chase's own employees as demonstrated above. As for Monarch customers, the damage is already done.

This is true, notwithstanding that Chase has proved it can communicate just the internal policy language to Monarch customers without mentioning sanctions. SUMF at ¶ 6; 8. It is still a mystery why Chase chose to (repeatedly) include the word "Sanctions" next to "Internal JPMC Policy" in its internal and external communications about Monarch's cancelled wires when it knew sanctions were not the reason for any cancellation, especially when it is able to omit such false and disparaging language. But the fact that it did resulted in an extremely defamatory implication, that not only Monarch's customers were exposed to, but that Chase's own employees also understood was meant by "due to Sanctions and/or Internal JPMC Policy."

There thus remains no genuine dispute as to any material facts, and Plaintiffs are entitled to summary judgment on Count III for defamation by implication.

**IV.    Plaintiffs' special and general damages to be sought at trial**

---

[2] It appears that this testimony was inaccurate. More than two months after the discovery deadline, Chase produced the policy that led to them communicating that transactions were cancelled "due to Sanctions and/or Internal JPMC Policy." Chase's Corporate representative testified that the language is never used for transactions actually blocked for sanctions and that language is only used for non-sanctions cancellations. SUMF at ¶ 4. This representative is on the team that sends the cancellation messages and is a go-between for the compliance department for non-sanctions cancellations. Chase 2/10/2021 Corp. Rep. Depo. Tr. 23:7-12. He did not know what the "Client Messaging Guidelines for Sanctions" policy was. *Id.* 71:15-72:4.

"Any person having suffered injury from defamation is entitled to recover damages. Florida law recognizes two categories of compensatory damages for defamation: general and special." *Army Aviation Heritage Found. & Museum, Inc. v. Buis.*, 504 F. Supp. 2d 1254, 1260 (N.D. Fla. 2007) (citing *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977)). A plaintiff can recover general damages, "those which the law presumes must naturally, proximately, and necessarily result from publication of libel or slander," when the plaintiff's reputation is impaired, "although no actual pecuniary loss is demonstrated." *Id.* When it comes to general damages "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." *Army Aviation*, 504 F. Supp. 2d at 1261. "The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering." *Id.* Special damages, however, "do not result by implication of law," and "it is necessary for a plaintiff to show his special damages proximately resulted from the defamation." *Id.* "[T]he chief characteristic of special damages is a realized or liquidated loss." *Anderson v. Smith*, No. 3:19-cv-222, 2020 WL 10058207, at *3 (M.D. Fla. Mar. 24, 2020).

But, "[w]ords which are actionable in themselves, or per se, necessarily import general damages and need not be pleaded or proved but are conclusively presumed to result." *Bobenhausen,* 344 So. 2d at 281. "A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se." *Army Aviation*, 504 F. Supp. 2d at 1259; *see, e.g., McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (citation omitted); *Diplomat Electric, Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 383 (5th Cir. 1967).

This is precisely the harm suffered by Plaintiffs from Chase's defamatory communications. Chase's insistence on including "sanctions" as a reason for cancelled wires together with mentioning OFAC ban lists severely prejudiced Monarch's ability to conduct its business, demonstrably deterred third parties from dealing with it, and impugned Monarch's method of doing business. Considered alone, without extrinsic evidence, Chase's statements to Monarch's customers are "so obviously defamatory" and "damaging to reputation" that they "give[ ] rise to an absolute presumption both of malice and damage." *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA

1973)). Thus, while Monarch will introduce evidence of actual liquidated damages suffered due to Chase's communications, the Court should grant summary judgment finding that the inherent defamatory nature of Chase's communications presumes Plaintiffs suffered further damages to its reputation and overall ability to conduct its trade.

## V.    Chase's Affirmative Defenses fail

### A.  Affirmative Defense No. 1

Chase asserts "truth or substantial truth" as its first affirmative defense. *See* [DE 85]. The evidence referenced in this motion showing that Chase admits Monarch is not and has never faced sanctions refutes this affirmative defense. *See* SUMF at ¶ 3, [DE 86-2, 86-4, 86-5 at 44:2-20; 49:24-25; 50:1-9]; SUMF at ¶ 8. Yet Chase continued to communicate to Monarch's customers that their wire transactions could not be executed due to "sanctions and/or internal JPMC policy." Also, Chase's defense that the inclusion of "and/or" makes the statements true, complete and accurate is refuted not only by the cited caselaw that explains "the use of the phrase "and/or" creates an ambiguity in whether the author means the first option, the second option, or both, *see Multitech Corp. v. St. Jons Bluff Inv. Corp*, 518 So. 2d 427, 431 (Fla. 1st DCA 1988), but also Chase's Corporate Representative's testimony admits these multiple, reasonable interpretations. *See id.* at ¶ 10, [DE 86-5 at 72:22-25;73:1-9]. Consequently, Chase's first affirmative defense fails as a matter of law and because it lacks evidentiary support.

### B.  Affirmative Defense No. 2

For its second affirmative defense, Chase asserts a "conditional privilege." [DE 85]. This defense is similarly defeated by the undisputed facts and law. The first element needed to prevail on such a privilege defense is "good faith." *Falic v. Legg Mason Wood Walker, Inc*., 347 F. Supp. 2d 1260, 1264 (S.D. Fla. 2004). Chase cannot make knowingly false statements (which they did) and then try to assert such statements were made in good faith. Such a statement establishes malice in fact negating a conditional privilege. *See, e.g.*, *Lewis v. Evans*, 406 So. 2d 489, 493 (Fla. 2d DCA 1981).

Chase's Corporate Representative also failed to testify about what "good faith" reliance Chase did to confirm the internal "investigation" that led to Monarch being placed on Chase's AML Interdiction List, which sparked this entire situation of cancelled wire payments. The Corporate Representative did not talk to (i) the GFIU unit who came up with these false "facts" about Monarch; or (ii) the Chase employees in the separate sanctions department who confirmed

it was not sanctions who still told Monarch's customers and vendors that they were, *see* SUMF at ¶ 14, [DE 86-5 at 51:13-25-52:1-2] ("We are separate from global sanctions compliance.") and *id*. at 97:11-12; 69:2-12 ("I do not work in the sanctions department."); or (iii) those at Chase charged with communicating with Monarch's customers and vendors who supposedly acted in good faith, *see id*. at 132:21-24 (Q: "Okay. Again, you didn't interview or talk with anybody regarding these communications with Monarch's customers, correct?" A: "I did not"); *Id.* at 20:13-15; 20:21-24.

Thus, especially under Federal Rule of Civil Procedure 37, since Chase failed to present a prepared witness or otherwise offer summary judgment evidence under Rule 56, summary judgment is appropriate on this affirmative defense as well. Chase falsely asserts that "[t]he alleged statements were also limited in scope to…the reasons Chase was unable [to] execute the transactions." The undisputed evidence is that Chase included a reason—"Sanctions"—in its statements to Plaintiffs' customers that was not a reason for cancelling the transactions, and that reason is never accurate when sent. So Chase's claim in this affirmative defense that the statements "were limited in scope to the reasons Chase was unable [to] execute the transactions," is contradicted by the undisputed evidence and the Plaintiffs are entitled to summary judgment on this affirmative defense.

C.   Affirmative Defense No. 3

Chase asserts that "Plaintiffs are Defamation-Proof." [DE 85]. "An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *Royal Palm Sav. Ass'n v. Pine Trace Corp.,* 716 F.Supp. 1416, 1420 (M.D. Fla. 1989). "A defense that simply points out a defect or lack of evidence in the plaintiff's case is not an affirmative defense." *Flav–O–Rich, Inc. v. Rawson Food Serv., Inc.* (*In re Rawson Food Serv., Inc.*), 846 F.2d 1343, 1349 (11th Cir. 1988). Chase's third affirmative defense is improper as it does not admit to making defamatory statements and instead disputes that damages, an element of Plaintiffs' claims, were caused by Chase at all.

"[O]n a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable," *Off. of Thrift Supervision v. Paul*, 985 F.Supp. 1465, 1470 (S.D. Fla. 1997) (citing *Blue Cross and Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990)), and it is "[o]nly upon such a showing [that] the burden shift[s] to [a] plaintiff regarding that affirmative defense," *Paul*, 985 F.Supp. at 1470 (citing *Weitz*, 913 F.2d at 1552 n. 13). "The reason is that the defendant bears the burden of proof on his affirmative defenses at

trial." *Paul*, 985 F.Supp. at 1470 (citing *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550–51 (11th Cir. 1990)). Here, Chase cannot present summary judgment evidence to show that the blog post or article mentioned was seen by any of Monarch's customers involved in this suit or vendors to whom Chase directly and repeatedly published falsehoods. Thus, Chase cannot meet its burden and summary judgment is appropriate in Plaintiffs' favor on affirmative defense no. 3.

### D. Affirmative Defense No. 4

Chase asserts that the "Plaintiffs' damages are barred in whole or in part by their failure to mitigate damages." [DE 85]. As explained above, Chase failed to meet its burden on this defense as it cannot present evidence that Plaintiffs did not mitigate their damages. Plaintiffs' Corporate Representative testified repeatedly about Monarch's attempts to mitigate by (i) charging Monarch's customers' credit cards when a wire with Chase was cancelled; and (ii) having protocols and policies in now in place to screen for Chase customers before they try to send wires and are told it will be cancelled because Monarch is engaging in criminal conduct such that doing business with them is illegal—i.e., sanctions. *See* SUMF at ¶ 15. Therefore, not only Chase cannot meet its burden here, but Plaintiffs have summary judgment evidence proving the contrary—Monarch did mitigate its damages. Thus, summary judgment is appropriate on affirmative defense no. 4 as well.

### E. Affirmative Defense No. 5

Affirmative defense no. 5 contends that Plaintiffs' claims for damages are barred by Monarch's deposit agreement with Chase. [DE 85]. However, exculpatory clauses such as the one found in the deposit agreement with Chase are unenforceable as to intentional torts, such as defamation. *Luria & Son, Inc. v. Honeywell, Inc.*, 460 So. 2d 521, 523 (Fla. 4th DCA 1984) (citing to *Zuckerman-Vernon Corp. v. Rosen*, 361 So. 2d 804 (Fla. 4th DCA 1978); *Mankap Enterprises v. Wells Fargo Alarm Serv.*, 427 So. 2d 332 (Fla. 3d DCA 1983)). Chase also terminated the relationship between itself and Plaintiffs as stated in Chase's November 27, 2020 letter to Monarch, which was reiterated in its February 9, 2021 letter to Monarch, SUMF at ¶ 16. Being that Plaintiffs no longer have Chase accounts after Chase severed its contractual and business relationship with them, Chase cannot now assert that they have free rein to engage in tortious conduct indefinitely because at one time Plaintiffs were accountholders. As a result, Plaintiffs are entitled to summary judgment on affirmative defense 5.

F.   Affirmative Defense No. 6

Chase's sixth affirmative defense also relies on the deposit agreement between Plaintiffs and Chase to contend that Chase had the authority to cancel wire transactions and close Plaintiffs' account. [DE 85]. Plaintiffs are not arguing otherwise. Regardless of the language used in the agreement, Chase may not lie and spread malicious falsehoods about the Plaintiffs in the process. And as referenced above, exculpatory clauses are unenforceable as to intentional torts. *Luria & Son, Inc.*, 460 So. 2d at 523. That is, even if the agreement could absolve Chase from liability for cancelling wires while including defamatory statements, such a clause is not be enforceable. Summary judgment is therefore appropriate in Plaintiffs' favor on affirmative defense no. 6.

G.   Affirmative Defense No. 7

Chase argues "causation" as its seventh affirmative defense, stating "[t]he Plaintiffs' claims against JPMC are barred, in whole or in part, because any damages allegedly suffered by Plaintiffs were the result, in whole or in part, of Plaintiffs' own legal fault or the fault of third parties over which JPMC has no control." [DE 85]. As discussed above (affirmative defense no. 3), "[a]n affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *Royal Palm Sav. Ass'n v. Pine Trace Corp.,* 716 F.Supp. 1416, 1420 (M.D. Fla. 1989). "A defense that simply points out a defect or lack of evidence in the plaintiff's case is not an affirmative defense." *Flav–O–Rich*, 846 F.2d 1343 at 1349.

Here, Chase's defense is not an affirmative defense at all as it fails to admit to the allegations in the complaint, fails to meet its burden of proof, and instead points the finger back at Plaintiffs in a bare-bones conclusory manner. *Office of Thrift Supervision*, 985 F.Supp. at 1470 (Defendant has the initial burden of proof on its affirmative defenses). Such an "affirmative defense" carries no legal significance and should be stricken. "Although Rule 8 does not obligate a defendant to set forth detailed factual allegations, a defendant must give the plaintiff "fair notice" of the nature of a defense and the grounds on which it rests. *Tsavaris v. Pfizer, Inc.*, 310 F.R.D. 678, 682 (S.D. Fla. 2015); *Adams v. Jumpstart Wireless Corp.*, 294 F.R.D. 668, 671 (S.D. Fla. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A court must not tolerate shotgun pleading of affirmative defenses and should strike vague and ambiguous defenses which do not respond to any particular count, allegation or legal basis of a complaint." *Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F.Supp.2d 1314, 1318 (S.D. Fla. 2005) (internal citations omitted).

Thus, Chase's affirmative defense no. 7 is inadequate and fails as a matter of law. Plaintiffs are thus entitled to summary judgment on affirmative defense no. 7.

H.  <u>Affirmative Defense No. 8</u>

Affirmative defense no. 8 asserts that "Plaintiffs' Second Amended Complaint fails to state any viable cause of action under Florida law." [DE 85]. "An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *Royal Palm Sav. Ass'n*, 716 F.Supp. at 1420. "A defense that simply points out a defect or lack of evidence in the plaintiff's case is not an affirmative defense." *Flav–O–Rich, Inc.*, 846 F.2d at 1349. Therefore, "failure to state a claim is not an affirmative defense." *Havana Docks Corp. v. Carnival Corp.*, 592 F. Supp. 3d 1088, 1194 (S.D. Fla. 2022); *see also Affiliati Network, Inc. v. Wanamaker*, No. 18-22576-CIV, 2019 WL 7376766, at *8 (S.D. Fla. Nov. 25, 2019), aff'd, 847 F. App'x 583 (11th Cir. 2021).

In *Havana Docks Corp.* and *Wanamaker*, the courts rejected the affirmative defense of failure to state a claim, not only because such a defense is not a legally proper affirmative defense, but also because such arguments had been rejected at the motion-to-dismiss stage. *Havana Docks Corp.*, 592 F. Supp. 3d at 1194; *Wanamaker*, No. 18-22576-CIV, 2019 WL 7376766, at *8. Similarly, Chase raised failure to state a claim in their motion for judgment on the pleadings [DE 26] ("The operative complaint is still insufficient to state a claim."), which was denied [DE 48]. A motion under Rule 12(c) is generally treated like a Rule 12(b)(6) motion to dismiss. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009); *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983) (citations omitted). Plaintiffs' Second Amended Complaint is substantively identical to its first amended complaint on which Chase's motion was denied. Plaintiffs are therefore entitled to summary judgment on this affirmative defense because Chase's eighth affirmative defense is legally improper, and because the Court already denied Chase's argument here.

<b><u>CONCLUSION</u></b>

Based on the undisputed facts and law, Chase defamed the Plaintiffs. Whether reviewed under standard defamation jurisprudence, much less the more expansive law governing defamation by implication, telling Plaintiffs' customers, vendors and banks that their wires are being canceled because of "sanctions" is defamatory. Adding the words "and/or JPM internal policy," especially after the reader has already read or heard "sanctions," is far too little, far too late. The inescapable

conclusion or impression left with the reader, including Chase's employees and Plaintiffs' bank (who are experienced in compliance), is that doing business with the Plaintiffs is illegal and that is why Chase cancelled their wires to and from Plaintiffs. Although Plaintiffs sustained special damages, actual damages are presumed from this defamation *per se*. Plaintiffs respectfully move under Rule 56 for summary judgment against Chase on Counts I, II and III, with damages to be liquidated at trial.

**WHEREFORE**, Plaintiffs, Monarch Air Group, LLC and David Gitman respectfully request that this Honorable Court enter an Order granting Plaintiffs' Motion for Partial Summary Judgment, awarding Plaintiffs reasonable attorney's fees and costs, together with any other relief that this Honorable Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and

served via the CM/ECF filer on **February 21, 2023**, on all parties and counsel of record: Derek E.

León, Esq., dleon@leoncogrove.com; Benjamin Weinberg, Esq., bweinberg@leoncosgrove.com,

eperez@leoncosgrove.com; Sofia Manzo, Esq., smanzo@leoncosgrove.com,

aquezada@leoncosgrove.com; LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor Miami,

Florida 33134.

Respectfully submitted,

STOK KON + BRAVERMAN
Attorneys for Plaintiffs
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com


*/s/Joshua R. Kon, Esq.*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)

# TAB 106

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC d/b/a                          CASE NO.: 21-cv-62429-WPD
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

       Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

       Defendant.

_____/

**PLAINTIFFS' AMENDED STATEMENT OF UNDISPUTED MATERIAL FACTS IN**
**SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

      Plaintiffs, Monarch Air Group, LLC d/b/a Mercury Jets, a Florida limited liability company

("Monarch") and David Gitman, an individual ("Gitman") (collectively, "Plaintiffs") by and

through the undersigned counsel, pursuant to Local Rule 56.1, hereby submits this Statement of

Undisputed Material Facts in Support of their Motion for Partial Summary Judgment.

      1.     Chase communicated to Monarch's customers and vendors that it could not

complete their wire transfers to Monarch "due to Sanctions and/or Internal JPMC Policy." [DE

86-1, 86-3, JPMC_1780-1902, 86-6 at 13]; JPMC_1929-2400[1].

      2.     Chase's own policies show that "sanctions" refers to criminal and other conduct

that are *per se* defamatory because "Sanctions are the economic arm of foreign policy used to

influence countries or individuals violating international laws or human rights, engaging in

_____

[1] Chase has produced additional documents, which pursuant to the Confidentiality Order [DE 47] and shall remain
"non-public" therefore Plaintiffs have filed a Motion for Leave to File Evidentiary Material in Support of their
Amended Motion for Summary Judgment Under Seal. Documents that have not been entered on the court docket are
referred to according to the Bates Stamp number provided within Chase's document production.

unlawful activity such as narcotics trafficking, human trafficking or activity that poses a security threat to other nations through the development and proliferation of weapons of mass destruction, chemical and biological weapons or acts of terrorism." *E.g.* JPMC_2407.

3.      Chase knew at the time it communicated to Monarch's customers and vendors that it could not complete their wire transfers to Monarch "due to Sanctions and/or Internal JPMC Policy" that Monarch was not subject to sanctions and that was not the reason that the wire transfers to Monarch were cancelled. [DE 86-2, 86-4, 86-5 at 44:2-20;49:24-25;50:1-9, 86-7, 86-8].

4.      Chase knew this because the statement "due to Sanctions and/or Internal JPMC Policy" is only ever sent when a transaction is cancelled for compliance reasons. Chase uses different language and identifies the sanction at issue when a transaction is blocked or rejected because of sanctions.   Chase 2/10/23 Corp. Rep. Depo. Tr. 45:5-10; 145:1-6; 149:11-150:8; 150:13-151:3[2].

5.      Cancelling a wire due to "JPMC Internal Policy" is distinct from being cancelled due to "sanctions." [DE 86-5 at 56:23-25;57:1-25;57:1-3].

6.      Chase commingles its sanctions compliance with its other internal policy compliance procedures. [DE 86-5 at 58:9-59:18, 86-12, 86-16 at 29:19-30:1;32:16-25].

7.      Chase's communications to Monarch's customers and vendors regarding cancelled wires resulted in Monarch being subject to distrust and caused serious harm to the function of its business and reputation. [DE 86-6, 1-25].

8.      Chase was fully capable of communicating non-defamatory statements to Monarch's customers, i.e., communications that did not mention sanctions as a reason for the

---

[2] The transcript of the February 10, 2023 Chase Corporate Representative Deposition will be filed under seal.

cancellation of wire transfers, as it did on at least one occasion and because the message templates used to send communications about cancelled transactions are editable. [DE 86-3, JPMC_1823]; Chase 2/10/2023 Corp. Rep. Depo. Tr. 110:18-111:9.

9.     Chase admits that replacing "and/or" with "and" in its statement to Monarch's customers and vendors that their wire transfers could not be completed due to "sanctions and/or internal JPMC policy" would lead to Chase making a false statement regarding Monarch. [DE 86-5 at 46:19-25;47:1].

10.     The phrase "and/or" indicates that the surrounding two words or expressions are to be taken together or individually. [DE 86-14, 86-15, 86-5 at 72:22-25;73:1-9, 86-16 at 35:15-19;44:6-16].

11.     After seeing in internal communications that Chase cancelled Monarch's wires "due to Sanctions and/or Internal JPMC Policy," Chase's own employees believed the cause of the cancellation was due to sanctions, and not because of internal Chase policy. [DE 86-5 at 61:10-25;62:1-12;108:16-25;109:1-8;120:3-15;121:5-12, 86-10, 86-11].

12.     Similarly, Plaintiffs current bank understood "due to Sanctions and/or Internal JPMC Policy" to mean sanctions when it asked Chase to "please urgently advise if this was reported to OFAC and under what sanctions." *See* JPMC_2329.

13.     At least one of Plaintiffs' customers understood the statement to mean sanctions when it responded to Chase "Can someone please tell me what sanctions mean? Is this business not good? I am booking flights with them." *See* JPMC_1933.

14.     Chase's Corporate Representative failed to testify regarding what "good faith" reliance Chase did to confirm the internal "investigation" that led to Monarch being placed on Chase's AML Interdiction List. The Corporate Representative did not talk to (i) the GFIU unit

who came up with these false "facts" about Monarch; (ii) the Chase employees in the separate sanctions department who confirmed it was not sanctions yet continued to tell Monarch's customers and vendors that they were; or (iii) those at Chase charged with communicating with Monarch's customers and vendors who supposedly acted in good faith. [DE 86-5 at 20:13-15; 20:21-24;51:13-25; 52:1-2;69:2-12;97:11-12;132:21-24].

15.     Monarch attempted to mitigate its damages by (i) charging Monarch's customers' credit cards when a wire with Chase was cancelled; and (ii) having protocols and policies now in place to screen for Chase customers before they try to send wires and are told it will be cancelled because Monarch is engaging in criminal conduct such that doing business with them is illegal – i.e., sanctions. *See* Monarch 12/10/2022 Corp. Rep. Depo. Tr[3].

16.     Chase terminated its contractual and business relationship with Plaintiffs effective December 27, 2019. [DE 86-4, 86-17].

**[CERTIFICATE OF SERVICE TO FOLLOW]**

---

[3] The transcript of the December 10, 2022 Monarch Corporate Representative Deposition will be filed under seal.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the CM/ECF filer on **February 21, 2023**, on all parties and counsel of record: Derek E. León, Esq., dleon@leoncogrove.com; Benjamin Weinberg, Esq., bweinberg@leoncosgrove.com, eperez@leoncosgrove.com; Sofia Manzo, Esq., smanzo@leoncosgrove.com, aquezada@leoncosgove.com; LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor  Miami, Florida 33134.

Respectfully submitted,

STOK KON + BRAVERMAN
Attorneys for Plaintiffs
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com


*/s/Joshua R. Kon, Esq.*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)

# TAB 108

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### (FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC d/b/a                    CASE NO.: 21-cv-62429-WPD
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

        Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

        Defendant.

_____/

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE 90]

Plaintiffs, Monarch Air Group, LLC d/b/a Mercury Jets, a Florida limited liability company ("Monarch") and David Gitman ("Gitman") (collectively, "Plaintiffs"), responds in opposition to Defendant, JPMorgan Chase Bank, N.A.'s ("Chase") Motion for Summary Judgment.

### INTRODUCTION

Chase knows that:

Sanctions are the economic arm of foreign policy used to influence countries or individuals violating international laws or human rights, engaging in unlawful activity such as narcotics trafficking, human trafficking or activity that poses a security threat to other nations through the development and proliferation of weapons of mass destruction, chemical and biological weapons or acts of terrorism.

In *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2209 (2021), the Supreme Court, in agreement with what Chase understands, concluded that merely suggesting that someone was potentially subject to OFAC sanctions equated to defamation because that person's reputation was harmed by being labeled "as potential terrorists, drug traffickers, or serious criminals." Chase's statement to Plaintiffs' customers that it could not "execute your transaction due to sanctions and/or Internal JPMC Policy" were paired with specific references to OFAC in the body of the message at least twenty times. The remaining statements included "OFAC Investigation Cancellation of Payment" in the subject line. *See* [DE 91-8-67] Exs. 8-67. At the time Chase made each of these statements Chase knew that Plaintiffs were not subject to sanctions. Yet, Chase uses "clever linguistic

subterfuge" to argue that their statements are true, were not about Plaintiffs, and were not made with express malice. Chase cites many cases discussing one way to show malice under Florida law (e.g., ill will, hostility, or an evil intention to defame and injure) but ignores that under Florida law, Plaintiffs can show express malice by showing that the Chase knew the defamatory statements were false when they made them, as the undisputed evidence shows is the case here. Chase is thus not entitled to summary judgment because, as a matter of law, their statements were defamatory *per se*, and as a matter of fact they knew the statements were false when they made them.

<u>**ANALYSIS**</u>

I.   <u>**Chase defamed Plaintiffs by falsely stating that it could not execute transactions to them "due to sanctions."**</u>

"Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). "A statement is defamatory if it 'tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation.'" *Rapp*, 997 So. 2d at 1109. *Sloan v. Shatner*, 8:17-CV-332-T-27AAS, 2018 WL 3769968, at *4 (M.D. Fla. June 22, 2018).

Defamation is actionable *per se*, or without a showing of special damages, if it: (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession. *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1248 (S.D. Fla. 2014), *aff'd,* (Feb. 17, 2015); *NITV, LLC v. Baker*, 61 So. 3d 1249, 1254 (Fla. 4th DCA 2011) (citing *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. 4th DCA 1973)) ("Communication that imputes to another conduct, characteristic, or condition incompatible with the proper exercise of his lawful business, trade, profession or office is slander per se."). When a communication is *per se* defamatory, malice and special damages are presumed. *Wolfson*, 273 So. 2d at 777.

A communication is "about" a defamation plaintiff if the entire communication has enough information for the recipient to figure out whom the defamatory statement is about. *Id.* at 779 (citing *O'Neal v. Tribune Co.*, 176 So. 2d 535, 548 (Fla. 2d DCA 1965); *Harwood v. Bush*, 223

So. 2d 359, 362 (Fla. 4th DCA 1969)); *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1258 (S.D. Fla. 2021). This is so even in for defamation *per se*. *See id.*

The defamatory statement must "be construed as the common mind would naturally understand it." *See McCormick v. Miami Herald Pub. Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962). The common-mind rule "means that the words should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard the same." *Wolfson*, 273 So. 2d at 778. The defamatory statement must be "considered in its natural sense without forced or strained construction." *Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). "A workable test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.*

A defamatory statement should not be given a tortured interpretation; instead, courts must construe the statement in the way the common mind and the reader to whom it was addressed would ordinarily understand it. *See Fortson v. Colangelo*, 434 F.Supp. 2d 1369, 1381-1382 (S.D. Fla. 2006).

> In determining the availability of a defamatory meaning for a given statement, a court considers the statement in the context of the publication as a whole and evaluates it as it would be understood by the common mind. A court must consider a publication in its totality, looking at all the words used, not merely a particular phrase or sentence. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.

*Folta v. New York Times Co.*, No. 1:17-cv-246-MW/GRJ, 2019 WL 1486776, at *10 (N.D. Fla. 2019) (internal citations and quotations omitted). "In assessing the status of potentially defamatory statements, a court 'must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication.'" *Id.* (internal citations omitted).

A. Chase's statement that they could not "execute your transaction due to Sanctions and/or internal JPMC Policy" is false

Using "clever linguistic subterfuge,[1]" Chase argues that its repeated statements that it cancelled transactions "due to sanctions" is true because it later included true information in the secondary portion of the statement. Because a common mind reading the statement would

---

[1] *See 100PlusAnimal Rescue, Inc. v. Butkus*, 17-61893-CIV, 2020 WL 13517903, at *11 (S.D. Fla. Sept. 30, 2020) (decrying the use of clever language to try to avoid a defamation charge).

conclude that Chase cancelled the transactions due to sanctions, as shown by how Chase's own employees and other banks understood the statement, the statement is false and defamatory.

Further, Chase argues that because "and/or" means "x or y or both," the Court is prevented from granting summary judgment because the statement has three potential meanings and requires a jury's consideration to determine how the statement would be reasonable understood. But even according to Chase, two thirds of its "due to Sanctions and/or internal JPMC Policy" statement is false because it is undisputed that the transactions were not cancelled because of "sanctions." Yet Chase relies on legalistic arguments about what the legal meaning of "and/or" is to say that the statement is literally true. But that is not the test for defamation. The test is how a common-mind would understand the statement looking at the effect the statement has in comparison with truth's effect. *Byrd v. Hustler Mag., Inc.*, 433 So. 2d at 595.

Here, the undisputed evidence is that Chase's own employees, Plaintiffs' current bank, and at least one of Plaintiffs' customers understood the statement to be referring to sanctions. SUMF # 11-13. This undisputed evidence shows that the effect of Chase's statement was that those who read the message believed that Plaintiffs were subject to sanctions and that it injured Plaintiffs' business standing. SUMF # 13 ("Is this business good").

It is undisputed that these transactions to Plaintiffs were not cancelled because of sanctions. Equally undisputed is that the "due to Sanctions and/or internal JPMC Policy" language is only ever sent for transactions cancelled for non-sanctions reasons. SUMF # 4. But Chase still argues that "[b]ecause Chase was unable to execute the transaction due to 'Internal JPMC Policy,' the Statement was factually 'true' and 'not readily capable of being proven false.'" Mot. Summ. J. [DE 90] 8. That argument does not pass the laugh test especially when everyone agrees that "the Statement" included "Sanctions" and everyone agrees that Chase did not cancel the transactions because of "Sanctions." Yet Chase takes it one step further.

Despite the undisputed evidence, Chase frivolously argues that "there is no evidence that Chase juxtaposed or omitted anything in the 'four corners' of the Statement, or the message in which the Statement was made, 'so as to imply' in the 'plain and natural meaning of the words used,' the statement was false." *Id.* No evidence other than, of course, the undisputed facts that Plaintiffs were not subject to sanctions, Chase included Sanctions in "the Statement," Chase only sends "the Statement" for non-sanctions cancellations, and Chase did not include any information or clarification that Plaintiffs were not subject for sanctions, even when repeatedly prompted by

Plaintiffs' customers and current bank. Other than that evidence, there is nothing. Because the undisputed evidence shows that "the Statement" was false, Chase is not entitled to summary judgment that it was true.

B. The Statements were about the Plaintiffs

Each statement Chase made to Plaintiffs' customers was about a transaction *with* Plaintiffs, referred to the transaction reference number, and included the dollar amount of the transaction. *See, e.g.*, R-JPMC_00001820. Chase still argues that the statements were not about Plaintiffs.[2] Mot. Summ. J. [DE 90] 8-9. But a communication is "about" a defamation plaintiff if the entire communication has enough information for the recipient to figure out whom the defamatory statement is about. *Wolfson*, 273 So. 2d 779 (citing *O'Neal*, 176 So. 2d at 548; *Harwood*, 223 So. 2d at 362). This is so even in for defamation *per se*. *See id.*

Plaintiffs' customers understood that the Statements were about the Plaintiffs. *See* SUMF at ¶ 7, [DE 86-6]:

> I just tried to wire funds to your account and the bank said they could not wire to that account. Said it was flagged by their compliance department and [sic] they would not do business with Monarch Air Group. I bank with JP Morgan Private Bank. That can't be a good thing for your company as it's the largest bank in the US. Any insights here?

*Id.*, [DE 86-6, at 10]:

> I am, however, a bit concerned that your company can not receive wire transfers from one of the largest financial institutions in the world after you told me that wire transfers are one of two ways to pay for this service. Chase has indicated that sending money to your company is considered "risky," which does not indicate that your services are incredibly trustworthy. Is there something you might provide to show me otherwise? I would really like to complete this transaction and have a guarantee that there will be a plane waiting to take me to and from New York.

---

[2] Chase relies on *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259-60 (S.D. Fla. 2021), to argue that you cannot look outside the four corners of the statement to determine about whom *per se* defamatory statement is about. Mot. Summ. J. [DE 90] 9 n.6. But, because this Court must apply the law that would apply if this case was in state court, *Wolfson* and *Harwood* are binding on this Court. *See Bravo v. United States*, 532 F.3d 1154, 1165–66 (11th Cir. 2008); *New S. Communications, Inc. v. Houston Cas. Co.*, 835 Fed. Appx. 405, 412 n.6 (11th Cir. 2020) ("Here, the case was initially filed in the Circuit Court of the 16th Judicial Circuit in and for Monroe County, so where a conflict among Florida's Circuit Courts of Appeal exists, we must apply decisions of Florida's Third District Court of Appeal."); *Peoples Bank of Polk Cnty. v. Roberts*, 779 F.2d 1544, 1546 (11th Cir. 1986) (citation omitted).

*Id.*, [DE 86-6, at 7]:

> I don't understand why my Chase wires keep coming back. They say: We are unable to execute your transaction due to Sanctions and/or Internal JPMC Policy. This makes me nervous every time I see sanctions. My bank is telling me it's you guys. Please tell me everything is OK. I need to make sure that we are all set. I am used to being charged ahead of time – which is fine but I am concerned I am going to show up and [t]here will be no plane.

*Id.*, [DE 86-6, at 13]:

> Can someone please tell me what sanctions mean? Is this business not good? I am booking flights with them.

SUMF # 13

Each of these examples shows that Plaintiffs' customers had no trouble recognizing who the statements were about—the Plaintiffs. For that reason alone, the Court cannot grant summary judgment to Chase—the evidence conflicts with Chase's assertion. And despite each statement including a transaction number, date and amount, Chase also argues that the messages and statements about cancelling transactions with the Plaintiffs did not include "'any other descriptive information' that made either Plaintiff's identity 'readily ascertainable.'" [DE 90] 9. But Chase itself uses the information within the messages to verify them. 2/10/23 Corp. Rep. Depo. 82:25-83:20. And Chase sends the same statement to banks within a transaction chain that need to know that Chase will not process a wire to Plaintiffs. *See id.* 83:21-85:15. The undisputed evidence is that Chase sends these messages to tell clients and other banks that transactions with Plaintiffs would not be executed. And that the details in the messages includes enough information for each bank that is a party to a wire transaction to know which party has received the wire. *Id.* 99:12-100:17. Chase includes enough information for banks within a transaction chain to "readily ascertain" who each party in a transaction is. *Id.* Chase invites the Court to reject the common-mind-understanding of its defamatory statements, to ignore the information it included in the four corners of its defamatory communication, and to find that it was not readily ascertainable that the statements were about Plaintiffs. As a reasonable juror, the Court cannot accept Chase's invitation.

Chase recognizes that OFAC "administers economic sanctions against *hostile targets*," and that "[f]inancial institutions are required to review their *customers and parties to transactions* against the OFAC…SDN List and to block (hold assets) or reject a transaction when an SDN is

*party to the transaction.*" *See* SUMF at ¶ 2. Yet Chase argues that statement is "plainly directed to, and 'about,' the 'transactions' referenced therein." [DE 90] 9. Chase's own policies show that sanctions are targeted at parties, not transactions. Plaintiffs' customers know that they are not sanctioned, and there is no evidence that any of their other transactions were even flagged. The common mind interpreting a communication cancelling only transactions with a party "due to sanctions" when it knows that itself was not sanctioned, could only conclude that the sanctioned party is the transaction counter-party—here, the Plaintiffs.[3]

Lastly, Chase argues that "[t]he term 'sanctions' does not constitute 'criminal activity,' as Plaintiffs suggest, regardless." [DE 90] 10. But it is not only Plaintiffs that suggest that "sanctions" refer to criminality, it is the Supreme Court and Chase itself agree that "sanctions" are seriously criminal in nature. *See* SUMF at ¶ 1 ("Sanctions are the economic arm of foreign policy used to influence countries or individuals *violating international laws* or human rights, engaging in *unlawful activity* such as *narcotics trafficking*, *human trafficking*, *weapons trafficking* or activity that poses a security threat to other nations through the development and proliferation of weapons of *mass destruction*, *chemical* and *biological weapons* or *acts of terrorism*."); *TransUnion*, 141 S.Ct. 2209 (holding that merely suggesting that someone was potentially subject to OFAC sanctions equated to defamation because that person's reputation was harmed by being labeled "as potential terrorists, drug traffickers, or serious criminals."). Chase's citations are inapt. That OFAC's powers are not "criminal in nature" or "do not constitute criminal prosecution" does not mean that "sanctions" itself does not infer criminal conduct. And a statement is defamatory *per se* if it: (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession. Even if not criminal, telling Plaintiffs' customers that Chase could not transfer money to Plaintiffs "due to sanctions" injures their business reputation and/or subjects them to hatred, distrust, ridicule, contempt, or disgrace. Though Chase refused to answer, few people want to do business with terrorists, arms traffickers, and human traffickers. 2/10/2021 Corp. Rep. Depo. 140: 2-141:14.[4] Nor would they trust them.

---

[3] This case is unlike when a newspaper publishes a defamatory statement about person without naming them. Here, the statements are communicated directly to those transacting and banking with the Plaintiffs.

[4] "So you would agree with me that based upon what Chase is saying that a sanction is pretty bad, right? A. I would say that this is just kind of outlining the definition of what sanctions are. Q. And

Chase's statements to Plaintiffs' customers, vendors, and banks were about Plaintiffs. At a minimum, each statement referenced OFAC in its subject line. Each statement included information Chase used to verify the statement's accuracy. Each statement included information that the recipient of the statement could determine who the statement was about. Chase's defamatory statements were thus about Plaintiffs. *Wolfson*, 273 So. 2d 779 (citing *O'Neal*, 176 So. 2d at 548; *Harwood*, 223 So. 2d at 362).

C. <u>Plaintiffs were damaged.</u>

As a first matter, Chase's statements were *per se* defamatory so Plaintiffs need not prove damages because damages are conclusively presumed. *Harris v. Plapp*, 47 Fla. L. Weekly D2430, 2022 WL 17173916, *3 (Fla. 1st DCA Nov. 23, 2022) (citing *Joopanenko v. Gavagan*, 67 So. 2d 434, 436 (Fla. 1953)) (holding that where a statement's nature is to cause reputational harm a plaintiff does not need any evidence of reputational harm to support a damage award). "A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se." *Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (citing *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986)).

"Any person having suffered injury from defamation is entitled to recover damages. Florida law recognizes two categories of compensatory damages for defamation: general and special." *Army Aviation*, 504 F. Supp. 2d at 1260 (N.D. Fla. 2007) (citing *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977)). General damages, "those which the law presumes must naturally, proximately, and necessarily result from publication of libel or slander," are allowed when the plaintiff's reputation is impaired, "although no actual pecuniary loss is demonstrated." *Id*. When it comes to general damages "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." *Army Aviation*, 504 F. Supp. 2d at 1260 (citing *Firestone v. Time, Inc.*, 305 So.2d 172, 177 (Fla.1974), *vacated and remanded on other grounds*,

sanctions are very bad, right? A. I wouldn't say that. Q. Really? You don't think human trafficking and weapons of mass destruction is very bad? A. I don't think those are very good things, human trafficking, no. Q. But they're not very bad either in your–in Chase's opinion, I guess?...You're asking me two different questions. You're asking me if I think sanctions are bad. And you're asking me if I think human trafficking is bad."

*Time, Inc. v. Firestone*, 424 U.S. 448, 460–461 (1976)). "The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering." *Id.* Chase's arguments presume that their defamation was *per quod*.

Chase mainly relies on Plaintiffs' response to its interrogatory asking Plaintiffs to "describe in detail the damages you claim to have incurred *as a result of the conduct alleged in the Complaint*." [DE 90] 11 (emphasis added). As a refresher, Plaintiffs alleged that Chase transmitted false information that "Gitman are currently on the Office of Foreign Assets Control's ("OFAC's") ban list, sanctions lists, or another non-compliance lists together with other false allegations and/or implications of purported criminal, risky, untrustworthy or other nefarious activity," that they could not execute transactions "due to sanctions," Chase knew that Plaintiffs were not sanctioned, and Chase's defamation "significantly interfered with Plaintiffs' ability to transact business, have injured Plaintiffs' reputation and goodwill, and have directly and proximately caused Plaintiffs to suffer substantial damages." 2nd Am. Compl. ¶¶ 15-18, 20, 23. Chase presumed all those allegations in its Interrogatory. Still, Chase argues that Plaintiffs' "purported damages result solely from (1) credit card fees, and (2) 'restrictions on receiving bank wire transfers.'" [DE 90] Plaintiffs answered with the special damages cause by Chase's defamation. In addition, Plaintiffs' initial disclosures informed Chase that "the full measure of Plaintiffs' damages will be presented with expert analysis and opinion as to damages such as lost profits, loss of good will and loss of reputation." *See* Initial Disclosures § III[5]. Chase's interrogatory did not change Plaintiffs' initial disclosures. Plaintiffs have now served Chase with an expert report detailing their damages. *See* Expert Report[6].

Plaintiffs mitigated the chances of Chase defaming them by asking their customers if they were sending wires from a Chase account; if they answered "yes," Plaintiffs charged the customer's credit card instead without passing on the fee. D. Gitman Depo. Tr. 50:24-51:16. Plaintiffs did this to prevent Chase from telling or implying that they were subject to sanctions. In one case, after Chase cancelled a wire "due to sanctions," a Forbes-listed person elected to lose $40,000 and not fly with Plaintiffs because of Chase's statement. *Id.* 122:13-124:9. But for Chase's defamatory statements, Plaintiffs would not need to screen customers to find out if they bank with

---

[5] Pursuant to the Confidentiality Order [DE 47] documents that have not been entered on the court docket will be filed under seal.
[6] Expert Report will be filed under seal.

Chase. Could Chase legally cancel transactions to Plaintiffs? Yes. But the damages and need for mitigation are not the same. Because Chase continues to defame Plaintiffs, Plaintiffs do what they can to prevent their customers from hearing the defamation to their monetary detriment.

## II. <u>Chase had malice in fact when it defamed Plaintiffs because it knew that its statements were false when they made them.</u>

Chase is not entitled to summary judgment on Plaintiffs' right to punitive damages or on its privilege defense because Chase made its statements with malice in fact. That is, Chase knew the statements were false when they made them.

### A. Punitive Damages

"The singular protection afforded by Florida law to personal reputation in actions for defamations per se is further seen by the fact that punitive damages may be the primary relief in a cause of action for defamation per se." *Lawnwood Med. Center v. Sadow*, 43 So. 3d 710, 730 (Fla. 4th DCA 2010) (citing *Abraham v. Baldwin,* 42 So. 591, 592 (1906)) ("the court held that with defamation per se the law presumes malice in their utterance making it unnecessary to prove express malice").

> Florida's unusually high protection of personal reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: "Thou shall not bear false witness against thy neighbor." The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law's most severe condemnation, its highest blameworthiness, its most deserving culpability. For slander per se, reprehensibility is at its highest.

*Id.*

Chase relies on *Hunt v. Liberty Lobby*, 720 F.2d 631, 650 (11th Cir. 1983)[7] (citing Matthews *v. Deland State Bank*, 334 So.2d 164, 166 (Fla. 1st DCA 1976); *Brown v. Fawcett Publications, Inc.*, 196 So.2d 465, 472–73 (Fla. 2d DCA 1967)), to argue that only if the Plaintiffs prove that Chase had "ill will, hostility or a an evil intention to defame and injure" can the Plaintiffs recover punitive damages. That is not a complete statement of Florida law.

---

[7] In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 763 (1985), the Supreme Court held that when a defamatory statement does "not involve matters of public concern," a plaintiff does not need to show actual malice.

Under Florida law, a plaintiff is entitled to punitive damages if it can prove 1) "malice in fact, i.e. express malice, or 2) ill will, hostility, or evil intention to defame and injure deducible from the character of the publication itself, which is the equivalent of express malice." *Brown*, 196 So. 2d at 469 (citing *Montgomery v. Knox*, 3 So. 211, 217 (1887)).

What is malice in fact? "Proof that defamation is false, and was known to be such by the publisher, certainly establishes malice in fact, but that is by no means the only way to prove malice." *Lewis v. Evans*, 406 So. 2d 489, 493 (Fla. 2d DCA 1981); *Caldwell v. Personal Fin. Co.*, 46 So. 2d 726, 727 (Fla. 1950) ("If…the appellee knew at the time of making its statement…that said statement was false the communication should be held in law to be malicious…."); *Caldwell v. Crowell-Collier Pub. Co.*, 161 F.2d 333, 336 (5th Cir. 1947).

Here, Plaintiffs have presented ample evidence that Chase knew that its statement "due to sanctions" was false when it was made. To recount, the language "due to Sanctions and/or internal JPMC Policy" is only ever sent for transactions cancelled for non-sanctions reasons, SUMF at ¶ 4, and Chase's internal communications confirms this knowledge,[8] SUMF at ¶ 3. This evidence is more than enough to preclude summary judgment in Chase's favor on punitive damages because Chase defamed Plaintiffs with malice in fact.

## B.  Conditional Privilege

A plaintiff overcomes a defendant's conditional privilege if it shows that defendant's defamatory statement was made with malice in fact. *See Am. Ideal Mgm't, Inc. v. Dale Vill., Inc.*, 567 So. 2d 497, 499 (Fla. 4th DCA 1990) (citations omitted) ("The qualified privilege vanishes, however, when the defamatory statement is made with express malice"); *Schreidell v. Shoter*, 500 So. 2d 228, 230 (Fla. 3d DCA 1986) (citing *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978)) ("Actual malice, or malice in fact, constitutes an abuse of a qualified privilege leaving the defendant liable."); *Pledger v. Burnup & Sims, Inc.*, 432 So. 2d 1323, 1327 (Fla. 4th DCA 1983) (citing *Axelrod*, 357 So. 2d at 1050) ("To overcome a qualified privilege, the injured party must prove express malice or malice in fact."); *Lewis*, 406 So. 2d at 493. Chase knew that Plaintiffs

---

[8] Chase claims that all it did was "provide minimalistic information to Chase's accountholder regarding the reason Chase was unable to execute a wire transaction." [DE 90] 15. The undisputed evidence is that Chase knew Plaintiffs were not subject to any sanctions and that the transactions were cancelled only because of Chase's internal policies. So when Chase said that it could not "execute your transaction due to sanctions" it was not providing a (or even "the") "reason Chase was unable to execute a wire transaction."

were not sanctioned and that sanctions was not the reason that the transactions were but still communicated that it could not execute "due to sanctions." This meets Plaintiffs' burden to show malice in fact ("Proof that defamation is false, and was known to be such by the publisher, certainly establishes malice in fact…."). Chase's assumed privilege "vanishes."

Chase, ignoring that, under Florida law, a plaintiff can prove malice in multiple ways, argues that Plaintiffs cannot prove that Chase had "ill will, hostility, and an evil intention to defame," so it cannot prove malice. [DE 90] 18. But because Plaintiffs have proven that Chase knew that Plaintiffs were not subject to sanctions and that sanctions was not a reason that the transactions were cancelled "Plaintiffs have "certainly establishe[d] malice in fact."

### III.   Chase cannot prove its entitlement to a conditional privilege.

Chase is not entitled to summary judgment on its privilege affirmative defense because it did not make the statements in good faith and it did not have a corresponding duty with Plaintiffs' customers. "The essential elements of the qualified privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner." *Falic v. Legg Mason Wood Walker, Inc*., 347 F. Supp. 2d 1260, 1264 (S.D. Fla. 2004) (citing *Thomas v. Tampa Bay Downs, Inc.*, 761 So.2d 401, 404 (Fla. 2d DCA 2000)). As above, Chase cannot make knowingly false statements and then assert that the statements were made in good faith. *Caldwell*, 46 So. 2d at 727; *Coogler v. Rhodes*, 21 So. 109, 113 (Fla. 1897).

Chase's also failed to testify about what "good faith" reliance it had. The Corporate Representative did not talk to (i) the Chase employees in the separate sanctions department who confirmed it was not sanctions yet continued to tell Monarch's customers and vendors that they were, *see* SUMF at ¶ 14, [DE 86-5 at 51:13-25 – 52:1-2] ("We are separate from global sanctions compliance.") and *id*. at 97:11-12; 69:2-12 ("I do not work in the sanctions department."); or (ii) those at Chase charged with communicating with Monarch's customers and vendors who supposedly acted in good faith, *see id*. at 132:21-24 (Q: "Okay. Again, you didn't interview or talk with anybody regarding these communications with Monarch's customers, correct?" A: "I did not"); *Id.* at 20:13-15; 20:21-24. The undisputed evidence is that Chase included a reason— "Sanctions"—in its statements to Plaintiffs' customers that was **not** a reason for cancelling the transactions. Thus, Chase's claim that the statements "were limited in scope to the reasons Chase

was unable [to] execute the transactions," is contradicted by the undisputed evidence. In fact, it is undisputed that Chase did not have good faith when it made knowingly false statements.

That the interests in a communication are mutual only births a qualified privilege if the communication parties have a joint interest in the background reasons for the statement; it is not enough for them to have a general interest in the statement. *Teare v. Local Union No. 295 of the United Ass'n of Journeymen & Apprentices of Plumbers & Pipe Fitters Indus. of U.S. & Canada*, 98 So. 2d 79, 83 (Fla. 1957). In *Teare*, a union official told someone employing the appellant as a plumber that for the sake of their health they should not use the appellant because his work was unsatisfactory. *Id.* at 81. The court held that the official's interest in promoting his union was not mutual with the employer's interest in getting their plumbing job done so the defamatory statements were not privileged. *Id.* at 83.

Similarly, here, Chase and Plaintiffs' customers did not have mutual interests. Chase's interest was to avoid transferring money to Plaintiffs because they were on their internal AML Interdiction List. Plaintiffs' customer's interest was to pay for their flights with Plaintiffs. These interests are not mutual and Chase does not have a privilege to defame Plaintiffs, especially with indisputably per se, false and totally gratuitous references to dastardly OFAC sanctions.

## IV.     <u>The single-publication rule does not apply here</u>

The single publication rule does not apply to private defamation and only applies in mass-defamation cases. *Musto v. Bell S. Telecom. Corp.*, 748 So. 2d 296, 298 (Fla 4th DCA 1999). The single publication rule is an exception to general defamation law and applies "where the same communication is heard at the same time by two or more persons." *Id.* at 297. This exception is designed to "avoid multiplicity of actions and undue harassment of the defendant by repeated suits by new individuals, as well as excessive damages that might have been recovered in numerous separate suits." *Id.* at 297-98.

Here, Chase made multiple publications to many customers, banks, and vendors. Plaintiffs could have brought a separate action for each independent communication. Chase concedes that it made each statement was "made to the accountholders private message address." [DE 90] 17.[9]

---

[9] If the Court does determine that Chase's statements were not defamatory, then the Court cannot dismiss Plaintiffs' tortious interference claims. As Chase recognizes, the point of the rule is to "prevent plaintiffs from circumventing a valid defense to defamation." [DE 90] 19. That is not a concern if the Court finds that Chase's statements are not defamatory. *See Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d204, 209 (Fla. 4th DCA 2002) (citing *Heekin v.*

Chase knew that the transfers to Plaintiffs were for travel and knew that they were payments for services. *See, e.g.*, JPMC 1020-21 ("the client is sitting at the airport waiting for the private charter to be paid for though this wire. Per the Client Service Manager and Banker, this wire is to pay for a private charter...," and "Monarch Airlines is on our interdiction list [redacted].While I understand the funds are for travel...."). Despite this evidence, Chase argues that "Plaintiffs cannot prove that Chase had knowledge of any business relationship under which the Plaintiffs had legal rights...." [DE 90] 20. Chase has no evidence to create a factual dispute about whether it knew about Plaintiffs' business relationships. The Court cannot grant Chase summary judgment.

Chase also argues that because Plaintiffs cannot prove that "malice was the sole basis" for its interference, Plaintiffs' claims fail. Chase's reading of the law is mistaken. Firstly, as briefed above, Chase made the statements with malice in fact, which overcomes Chase's claimed privilege. Secondly, Chase's argument is foreclosed by binding precedent. *KMS Rest. Corp. v. Wendy's Intern., Inc.*, 361 F.3d 1321, 1327-28 (11th Cir. 2004). Chase relies on *Ethyl Corp. v. Balter*, 386 So. 2d 1220 (Fla. 3d DCA 1980), to argue that malice needs to be the sole basis of Plaintiffs' claim.

> Ethyl stands for no such proposition. The Ethyl court inferred (although it was not called upon to decide the issue) that if the acts complained of were "solely the conception and birth of malicious motives" the interference would be actionable. This is certainly not to say the converse is true, i.e., that there can be no claim for tortious interference without proof that the defendant acted solely out of malice. The significant inquiry to determine the privilege of justification is whether the means employed are not improper.

*KMS Restaurant*, 361 F.3d at 1327 (citing *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1535 (11th Cir. 1985)). Here, Chase employed improper means when it included false information in its statements about why it cancelled Plaintiffs' customers' transactions. *Weisman v. Southern Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 651 (Fla. 4th DCA 2020) (citing Horizons Rehab., Inc. v. Health Care & Ret. Corp., 810 So. 2d 958, 964 (Fla. 5th DCA 2002)) ("'improper means' has been interpreted as 'doing no more than insist[ing] upon existent legal rights in a permissive way.'"). Chase did much more than that protecting its legal rights in a permissive manner when it

---

*CBS Broad., Inc.*, 789 So. 2d 355, 358-59 (Fla. 2d DCA 2001), *disapproved on other grounds*, *Anderson v. Gannet Co. Inc.*, 994 So. 2d 1048 (Fla. 2008)).

knowingly included false information about Plaintiffs in its statements. Suffice it to say, Chase is not entitled to any type of judgment in its favor, summary or otherwise.

## **CONCLUSION**

Chase made many knowingly false statements about Plaintiffs, as the undisputed evidence shows. Chase made the statements with malice in fact. That, too, cannot be disputed. Plaintiffs are entitled to punitive damages and Chase's claimed privileges vanish. That evidence in the record more than satisfies Plaintiffs' burden to avoid summary judgment.

**WHEREFORE**, Plaintiffs, Monarch Air Group, LLC and David Gitman respectfully request that this Honorable Court deny Chase's Motion for Summary Judgment, together with any any other relief that this Honorable Court deems just and proper.

## **[CERTIFICATE OF SERVICE TO FOLLOW]**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the CM/ECF filer on **February 21, 2023**, on all parties and counsel of record: Derek E. León, Esq., dleon@leoncogrove.com; Benjamin Weinberg, Esq., bweinberg@leoncosgrove.com, eperez@leoncosgrove.com; Sofia Manzo, Esq., smanzo@leoncosgrove.com, aquezada@leoncosgove.com; LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor Miami, Florida 33134.

Respectfully submitted,
STOK KON + BRAVERMAN
Attorneys for Plaintiffs
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/Joshua R. Kon, Esq.*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)

# TAB 109

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC d/b/a                    CASE NO.: 21-cv-62429-WPD
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

      Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

      Defendant.
_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S STATEMENT OF**
**UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT [DE 91]**

      Plaintiffs, Monarch Air Group, LLC d/b/a Mercury Jets, a Florida limited liability company ("Monarch") and David Gitman, an individual ("Gitman") (collectively, "Plaintiffs"), pursuant to Fed. R. Civ. P. 56 and Rule 56.1 of the Local Rules for the Southern District of Florida, file this Response in Opposition to Defendant, JPMorgan Chase Bank, N.A.'s ("Chase") Statement of Undisputed Material Facts In Support of Motion For Summary Judgment [DE 91].

     1.      Undisputed.

     2.      Undisputed.

     3.      Undisputed.

     4.      Undisputed.

     5.      Undisputed.

     6.      Undisputed.

     7.      Undisputed.

     8.      Undisputed.

     9.      Undisputed.

10.     Undisputed.

11.     Undisputed.

12.     Undisputed.

13.     Undisputed.

14.     Disputed. Chase also cancelled wire transactions from Monarch and/or David Gitman made for personal reasons to non-Chase accountholders such as the payment of David Gitman's home mortgage. Monarch Corporate Representative Dep. Tr. [DE 86-18]* at 43:10-25; 44:1-13.

15.     Disputed. The Chase accountholders that Chase sent messages to on behalf of cancelled transactions with Monarch were only on the remitting side of the transactions. Further, the messages that Chase sent out to these Chase accountholders were not all identical and included information other than the quoted language in Chase's Statement of Facts. For example, in the "Details" section of the messages, OFAC/OFAC Investigation Cancellation of Payment is included. [DE 86-3], JPMC_1780-1902.

16.     Disputed. These messages were not only sent to Chase's accountholders. The messages were sent to other bank's and financial institutions as well.

17.     Disputed. Chase has the ability to and did alter the quoted statement as seen in many of the messages sent from Chase to Monarch's customers and vendors. Some of the messages mention OFAC reporting, and on at least one occasion, Chase did not include the word "sanctions" in its message. Chase's Communications to Monarch's Customers [DE 86-3], JPMC_1748, 1753, 1760, 1763, 1766, 1768, 1771, 1774, 1790, 1796, 1799, 1805, 1808, 1823 (no mention of sanctions), 1831, 1852, 1860, 1863, 1867, 1888, 1891, 1896; Chase's Corporate Representative Dep. Tr. [DE 86-5] at 132:2-24.

18.     Undisputed* - Can't see cited Exhibit 68 under seal.

19.    Undisputed.

20.    Disputed. Plaintiffs acknowledge responding to Chase's Second Set of Interrogatories, request No. 3, as stated in Chase's Statement of Facts. However, this response was generated prior to the close of discovery and the production of many documents from Chase in response to Plaintiffs' document requests. Thus, Plaintiffs' response as quoted in Chase's Statement of Facts at ¶ 20 does not represent a full and complete answer based on the new information obtained from Chase's document production in discovery, including documents disclosed on January 17 and 27.

21.    Disputed. Plaintiffs acknowledge responding to Chase's Second Set of Interrogatories, request No. 5, as stated in Chase's Statement of Facts. However, this response was generated well before the deadline for expert disclosure, the close of discovery and the production of many documents from Chase in response to Plaintiffs' document requests. Thus, Plaintiffs' response as quoted in Chase's Statement of Facts at ¶ 21 does not include damage estimates based on Plaintiffs' expert reports and therefore does not represent a full and complete answer benefiting from Plaintiffs' damage expert reports, which Plaintiffs told Chase would be disclosed through experts in their Initial Disclosures.

22.    Undisputed.[1]


**[CERTIFICATE OF SERVICE TO FOLLOW]**


---

[1]      The list published by The Department of Treasury's Office of Foreign Assets Control ("OFAC") is entitled "*Specially* Designated Nationals and Blocked Persons List," rather than "*Specifically* Designated Nationals and Blocked Persons List" as referenced by Chase.

*Plaintiffs' Response in Opposition to Defendant's Statement of Material Facts*
*Case No. 21-cv-62429-WPD*
*Page 4 of 4*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the CM/ECF filer on **February 21, 2023**, on all parties and counsel of record: Derek E. León, Esq., dleon@leoncogrove.com; Benjamin Weinberg, Esq., bweinberg@leoncosgrove.com, eperez@leoncosgrove.com; Sofia Manzo, Esq., smanzo@leoncosgrove.com, aquezada@leoncosgove.com; LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor  Miami, Florida 33134.

Respectfully submitted,
STOK KON + BRAVERMAN
Attorneys for Plaintiffs
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email:  service@stoklaw.com

*/s/Joshua R. Kon, Esq.*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)

# TAB 111

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 21-62429-CIV-DIMITROULEAS

MONARCH AIR GROUP, LLC d/b/a
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

      Plaintiffs,

vs.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

      Defendant.

_____/

**ORDER STRIKING PLAINTIFFS' AMENDED**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon the Court's careful consideration of Plaintiffs'

Amended Motion for Partial Summary Judgment [DE 105] (the "Motion") and Plaintiffs'

Amended Statement of Undisputed Material Facts ("PSOF") [DE 106], both filed herein on

February 21, 2023. The Court is otherwise fully advised in the premises.

Plaintiffs' Statement of Undisputed Material Facts does not comply with criteria set forth

in the Local Rules. *See* L.R. 56.1, which states in relevant part as follows:

(b) Form Required for Statements of Material Facts.

    (1) All Statements of Material Facts. All Statements of Material Facts
    (whether filed by the movant or the opponent) shall be filed and served as
    separate documents and not as exhibits or attachments. In addition, the
    Statements of Material Facts shall:

        (A) Not exceed ten (10) pages;

        (B) **Consist of separately numbered paragraphs,** ***limited as far***

1

> ***as practicable to a single material fact,*** with each fact supported
> by specific, pinpoint references to particular parts of record
> material, including depositions, documents, electronically stored
> information, affidavits, stipulations (including those made for
> purposes of the motion only), admissions, and interrogatory
> answers (e.g., Exhibit D, Smith Affidavit, ¶2; Exhibit 3, Jones
> deposition, p. 12/lines 4-9).
>
> The pinpoint citations shall reference pages (and line numbers, if
> appropriate, of exhibits, designate the number and title of each
> exhibit, and provide the ECF number of all previously filed
> materials used to support the Statement of Material Facts. When a
> material fact requires specific evidentiary support, a general
> citation to an exhibit without a page number or pincite (e.g.,
> "Smith Affidavit" or "Jones Deposition" or "Exhibit A") is non-
> compliant. If not already in the record on CM/ECF, the materials
> shall be attached to the statement as exhibits specifically titled
> within the CM/ECF system (e.g., Smith Affidavit dated April 12,
> 2017, Jones Deposition dated May 19, 2018). Reference to a
> previously filed exhibit shall use the "ECF No." format.

L.R. 56.1 (emphasis added).

As written, several of Plaintiffs' asserted facts do not consist of "separately numbered paragraphs, limited as a far as practicable to a single material fact." *See, e.g.*, PSOF ¶¶ 8, 14-15. Moreover, Plaintiffs improperly intermingle legal conclusions and arguments in many of the asserted facts, making it difficult to determine whether the asserted fact is a fact for purposes of summary judgment. *See, e.g.,* PSOF ¶ 2 ("Chase's own policies show that 'sanctions' refers to criminal and other conduct that are *per se* defamatory because . . . ."); PSOF ¶ 8 ("Chase was fully capable of communicating non-defamatory statements to Monarch's customers, i.e., communications that did not mention sanctions as a reason for the cancellation of wire transfers . . . ."); PSOF ¶ 15 ("Monarch attempted to mitigate its damages by . . . ."). The Local Rules specify that "[i]f a party files and serves any Statement of Material Facts that does not comply with this rule, then the Court may strike the Statement…." L.R. 56.1(b)(1).

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Amended Motion for Partial Summary Judgment [DE 105] and Plaintiffs' Amended Statement of Undisputed Material Facts [DE 106] are hereby **STRICKEN**.

2. On or before **February 27, 2023**, Plaintiffs shall a Second Amended Motion for Partial Summary Judgment along with a statement of material facts consistent with this Order and the Local Rules. No additional amendments will be provided.

3. Defendant will then be permitted 14 days to file a Response and a statement of material facts controverting the facts contained in Plaintiffs' statement of material facts.[1]

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 22nd day of February, 2023.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished:
Counsel of record

---

[1] Plaintiff will thereafter have seven days to file a Reply brief.

3

# TAB 115

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC d/b/a                        CASE NO.: 21-cv-62429-WPD
MERCURY JETS, a Florida limited
liability company, and DAVID GITMAN,

      Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

      Defendant.

_____/

## PLAINTIFFS' MOTION FOR SANCTIONS

Plaintiffs, Monarch Air Group, LLC ("Monarch") and David Gitman, move the Court to sanction Defendant, JPMorgan Chase Bank, N.A. ("Chase") under Fed. R. Civ. P. 37:

### INTRODUCTION

At issue is Chase's written and oral defamatory communications to Plaintiffs' customers, vendors, and (now we know) banks that it could not complete transactions with Plaintiffs because of OFAC sanctions, when Chase confirmed and knew that Plaintiffs were not subject to any sanctions. Before receiving discovery, Plaintiffs did not know the full extent of these communications nor the exact language. It now appears that the vast majority of the defamatory statements were "[w]e are unable to execute your transaction due to Sanctions and/or Internal JPMC Policy." Some cancellations referred specifically to OFAC in the body of the communication and all refer to OFAC in the subject line of the communication.

Chase argues that the statement is not defamatory because it was "in fact, unable to execute the transaction due to 'Internal JPMC Policy,'" and because "the word 'sanctions' by itself does not implicate criminal activity." *See, e.g.,* Chase's Mot. Summ. J. [DE 90] at 2, 10.

The evening before Chase's corporate representative's deposition regarding documents that were "inadvertently" not disclosed, and more than two months after the discovery cutoff, Chase disclosed two versions (out of fourteen) of the policy that directed Chase employees to communicate that Plaintiffs' customers' transactions were cancelled "due to sanctions and/or Internal JPMC Policy" and that describes sanctions as being for serious war criminals and the

like. Chase's corporate representative confirmed that this defamatory statement is sent even though the department sending the statement *never* communicates with Chase's clients about transactions blocked or rejected because of actual sanctions (as that is done by a whole other part of the department)[1] and that Chase's employees had the ability to edit the messages to remove the always non-applicable and defamatory word "sanctions."

The Court should award Plaintiffs remedial relief against Chase for its failure to disclose highly relevant—if not the most relevant—documents until well after discovery was closed and completed. There is no other way for the severe prejudice to the Plaintiffs to be addressed, since there is no way for the Plaintiffs to un-ring the bell and redo all of the written discovery and depositions armed with all these new defamatory communications with Plaintiffs' customers, these entirely new libelous communications (and responses) from numerous financial institutions around the world including Plaintiffs' current bank, and the central internal policy governing the precise communications and department hierarchy at issue all along. This ameliorative relief should include any or all of the tools granted to the courts to deal with these issues under Rule 37, including establishing Chase's liability for defamation, as well as precluding Chase from opposing the *per se* nature of the statements made or supporting the assertion that the statements did not refer to Plaintiffs, attorneys fees and striking pleadings.

<u>**FACTUAL BACKGROUND**</u>

On May 4, 2022, a few weeks after Chase served its initial disclosures, Plaintiffs served discovery requests on Chase. Among Plaintiffs' requests, Plaintiffs asked Chase to produce "[a]ll documents and communications created during the following JP Morgan Investigations identified by" specific reference numbers, and "[a]ny policies, procedures, or manuals governing how Chase conducts investigations like the investigations identified in" the other request. *See* Plaintiffs' First Request for Production, **Exhibit A**. Chase conferred with Plaintiffs and asked for time to respond to Plaintiffs' discovery requests. Plaintiffs agreed. Chase responded and objected

---

[1] This was an especially jarring reveal at that 11th hour deposition, where the witness confirmed for the first time that Chase's Sanctions Service Utility department who made all these "Sanctions and/or JPMC Internal Policy" communications to thousands of people, regarding thousands of people on their internal interdiction list, *never* deals with a situation when a transaction is being blocked for actual sanctions. That means, by process of basic logical elimination, that any communication coming out of this subset of the SSU *always* conveys absolutely false sanctions references, and for no reason, as sanctions is *never* a reason the subject transactions are cancelled.

to the discovery on July 19, 2022 and produced some documents two days later, which included no policies.

Plaintiffs believed that Chase's objections were improper and that the produced documents were less than the total responsive documents in Chase's custody, possession and control. Plaintiffs conferred extensively with Chase about their objections and production. Chase agreed to supplement its discovery responses and document production. Chase represented that it would take time to identify and produce all responsive documents.  The discovery cutoff was set for November 3.

In the Parties' renewed joint motion to extend pretrial deadlines, [DE 55 at ¶11], Chase explained that it searched 818,000 emails from 33 custodians, conducted fact-finding within multiple departments within the bank, and reviewed and redacted many documents for supposedly non-discoverable information.[2] After the joint motion was granted, Chase served Amended Responses and Objections to Plaintiffs' First Request for Production. Six days later Chase produced additional documents supplementing its original July production. During another conferral email about the documents produced on November 10, Chase told the Plaintiffs that they were still preparing additional documents for production. Chase produced those other documents three weeks later.

On January 17, 2023, Chase produced additional responsive documents that were "inadvertently and unintentionally" not produced. Because of that late production, Chase consented to extend the time for Plaintiffs to respond to their summary judgment motion and allow Plaintiffs to depose Chase about the documents. The Court agreed.

Ten days later, Chase disclosed additional documents that it found when it conducted "searches of yet more platforms" to "ensure that all records related to the newly-discovered documents were gathered and produced." Chase also represented that "[a]ll searches are complete and exhausted." Plaintiffs did not alert the Court because the late disclosure was before Chase's deposition. Within those documents, Wells Fargo, Plaintiffs' current bank, repeatedly

---

[2]     Plaintiffs filed a motion to compel and for an *in camera* review of Chase's unilateral redactions [DE 59], but said motion was denied (i) because some of the redactions were based on a SAR's privilege and (ii) because Plaintiffs could only file their motion after they received the documents from Chase which was only a few days before the discovery cutoff [DE 67] ("Furthermore, given that Plaintiffs filed the Motion on the eve of the discovery deadline (expiring on December 5, 2022), the Court declines Plaintiffs' invitation to conduct an in camera review of the documents.")

responded to Chase Bank's libelous communications by stating that "your inquiry is under investigation," that "this matter is receiving [their] attention and [they] will respond in due course," "please advise if reported to OFAC," and "please urgently advise if this was reported to OFAC and under what sanctions." *E.g.* JPMC 2312, 2325, 2329

Nearly two weeks later, one business hour before Chase's deposition, Chase disclosed two versions of its Global Funds Processor policy governing the procedures that its Sanctions Service Utility Department ("SSU") used in deciding to send the defamatory communications.[3] Notwithstanding its representation that "[a]ll searches are complete and exhausted," during the preparation for the deposition Chase's corporate representative apparently told counsel about the Policy, questioning the diligence of Chase's internal investigation of the case and searches for responsive documents. The Policy provides that, if the reason that Chase's Compliance Department gives to cancel a wire is for compliance reasons, then SSU should communicate "WE ARE UNABLE TO EXECUTE YOUR TRANSACTION DUE TO SANCTIONS AND/OR INTERNAL JPMC POLICY. WE CONSIDER THIS MATTER CLOSED AND NO FURTHER ACTION WILL BE TAKEN. NO OFAC REPORTING WILL TAKE PLACE." Chase's corporate representative testified that his division within the SSU does not handle communications for transactions that are blocked or rejected because of actual OFAC sanctions and that the quoted language is communicated to Chase's clients only if a wire is cancelled for compliance reasons and not if a wire is cancelled because of sanctions.[4]

Therefore, because of serious and serial internal mishandling of documents and a continued failure of Chase to comply with their litigation discovery duties, Plaintiffs were not able to effectively question any of the various witnesses who personally acted and interacted with Monarch's customers, vendors, financial institutions and bank. Plaintiffs were also forced to waste time and effort trying to blindly piece together Chase's complex department hierarchy to try and understand who is instructing and investigating who to make these gratuitously false

---

[3] Plaintiffs will file the Policy under seal under the Court's confidentiality order.
[4] "Q. And, again, even though you – your department never communicates with clients if a wire is being canceled that's blocked or rejected because of sanctions, you still use these templates which includes sanctions, right? A. Correct. We use the templates available." And "Yeah, we – don't handle the investigation if the transaction has been blocked or rejected…Q. Because of sanctions, right?…The Witness: We don't – yeah. We don't handle the transaction if it's been blocked or rejected under OFAC sanctions or sanctions. This is not within us, yeah." 2/10/2021 Corp. Rep. Depo. Tr. 145:1-6; 150:19-151:3, **Exhibit __.**

statements about Plaintiffs. Producing another corporate representative at the 11th hour, from a mere communication-forwarding department that never dealt with Monarch and never even deals with situations involving actual sanctions, is far too little, far too late.  Indeed, after starting to review Chase's central policy governing the web of departments and their communications regarding OFAC Sanctions (which policy was only provided the evening before the deposition), Chase admits that it knew "[t]he Office of Foreign Assets Control (OFAC) administers economic sanctions against hostile targets to further US foreign policy and national security objectives." Further, while telling Monarch's customers, vendors and banks that transactions to Monarch cannot be processed because of "Sanctions" involving an "OFAC investigation" by their "Sanctions Service Utility department," Chase and its employees knew and confirmed (i) that neither Monarch nor Gitman were ever subject to any sanctions, OFAC or otherwise; and (ii) that "Sanctions" were no laughing matter. The concealed Policy puts it as follows:

> Sanctions are the economic arm of foreign policy used to influence countries or individuals violating international laws or human rights, engaging in unlawful activity such as narcotics trafficking, human trafficking, weapons trafficking or activity that poses a security threat to other nations through the development and proliferation of weapons of mass destruction, chemical and biological weapons or acts of terrorism.

§ 2.

But Plaintiffs were not able to confront any of Chase's witnesses who have personal knowledge of what occurred to Plaintiffs with any of these documents or evidence. Chase's corporate representative testified that he did not talk to any Chase employees to prepare for the deposition, he did not know what was said orally to Plaintiffs' customers, and he did not know what messages from other banks Chase responded to without referring to the audit trails that Chase's systems contain or other case files that he did not have available to review, and which were not produced to Plaintiffs at any time.

At bottom, Chase should have disclosed the Policy with its Initial Disclosures because it is relying on its policies to support its truth affirmative defense. Chase also should have at least produced the Policy because it responded to Plaintiffs' requests for production for the policies governing Chase's investigation. Chase also should have disclosed all the communications with all of Plaintiffs' customers, much less the communications and responses from numerous financial institutions including Plaintiffs' current bank, which entirely changes the landscape of the case and the damages to be sought. Plaintiffs suffered severe prejudice by not having these

central documents here until two months after all the depositions were done and discovery closed.

## **MEMORANDUM OF LAW**

"Discovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered." *Miccosukee Tribe of Indians of Florida v. Cypress*, 12-22439-CIV, 2013 WL 10740706, at \*1 (S.D. Fla. June 28, 2013) (quoting *Lee v. Max Intern., LLC*, 638 F.3d 1318, 1322 (10th Cir.2011) (Gorsuch, J.)).

A party must provide or describe all documents that it "may use to support its claims or defenses." Fed R. Civ. P. 26(a)(1)(A)(ii). Parties must supplement their discovery responses. Fed R. Civ. P. 26(e)(1)(A). A party's attorney must sign every disclosure and "[i]f a certification violates this rule without substantial justification, the court ... must impose an appropriate sanction on the…party on whose behalf the signer was acting…." Fed. R. Civ. P. 26(g)(3); *see Brandt v. Magnificent Quality Florals Corp*., 2009 WL 899925, at \*3 (S.D. Fla. Mar. 31, 2009) (Rule 26(g)(3) authorizes imposing sanctions for an improper certification that are traceable specific discovery abuses.), *aff'd*, 371 F. App'x 994 (11th Cir. 2010).

Under Rule 37 a trial court has discretion in responding to a litigant's failure to make a disclosure required by Rule 26. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial…" Fed. R. Civ. P. 37(c)(1). The court also can order payment of the expenses caused by the failure, inform the jury of the party's failure, and impose other appropriate sanctions. Fed. R. Civ. P. 37(c)(1)(A)-(C); *see also Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 593 (11th Cir. 2019).

Other appropriate sanctions include 1) establishing facts against the non-disclosing party, 2) prohibiting the non-disclosing party from "supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," 3) striking pleadings, 4) staying proceedings, and 5) rendering a default against the non-disclosing party. Fed. R. Civ. P. 37(c)(1)(C). Dismissal—and lesser sanctions—are appropriate if a non-disclosing party's failure was willful, with bad faith, or because it disregarded its responsibilities. *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 481 (11th Cir. 1982) (citing *Jones v. Louisiana State Bar Ass'n*, 602 F.2d 94, 97 (5th Cir. 1979))

Only if the non-disclosing party establishes that "the failure was substantially justified or is harmless" may that party introduce undisclosed evidence. Fed. R. Civ. P. 37(c)(1). "Rule 37(c)(1) requires absolute compliance with Rule 26(a), in that it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or substantially justified." *United States v. Batchelor-Robjohns*, 2005 WL 1761429, at *2 (S.D. Fla. June 3, 2005) (quoting *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir.2003)) (cleaned up). The non-producing party has the burden to show that its actions were substantially justified or harmless. *Id.*; *Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821, 824 (11th Cir. 2009)).

A court considering whether a non-disclosure was justified or harmless considers 1) the non-disclosing party's reason for not disclosing, 2) the information's importance, and 3) the prejudice to the opposing party. *Lips v. City of Hollywood*, 350 Fed. Appx. 328, 340 (11th Cir. 2009) (citing *Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir.2008)). When important information is withheld, and its late disclosure causes prejudice the non-disclosure is not harmless. *Berryman-Dages v. City of Gainesville Fla.*, 1:10CV177-MP-GRJ, 2012 WL 1130074, at *2 (N.D. Fla. Apr. 4, 2012) (citing *Lips*, 350 Fed. Appx. at 340). "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question." *Id.* (citing *Mitchell*, 318 Fed. Appx. at 824).

Furthermore, district judges are given broad discretion to fashion appropriate discovery sanctions. *Malautea v. Suzuki Motor Company, Ltd.*, 987 F.2d 1536 (11th Cir.1993). "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process." *Preferred Care Partners Holding Corp. v. Humana, Inc*., , 2009 WL 982460, at *2 (S.D. Fla. Apr. 9, 2009), *citing Sphinx Int'l, Inc., v. Nat'l Union fire Ins. Co. of Pitt*., 2003 WL 24871000, at * 8 (M.D.Fla. March 21, 2003), *citing Aztec Steel Co. v. Fla. Steel Corp*., 691 F.2d 480, 482 (11th Cir.1982).

Here, Plaintiffs are prejudiced by Chase's willful failure to disclose the central Policy at issue in this litigation—the Policy causing Chase to defame Plaintiffs—until more than two months after the extended discovery cutoff, by Chase's reckless failure to disclose relevant documents until one week before Plaintiffs' deadline to respond to Chase's summary judgment motion, and by Chase's corporate representative not being prepared to answer questions about

the late-disclosed documents, including communications and responses from Plaintiffs' current bank.

The Court should sanction Chase[5] for its repeated failures to disclose by requiring it to pay Plaintiffs' reasonable expenses incurred in preparing and filing DE 99, preparing for and taking the February 10 Corporate Representative Deposition, and for this motion. The Court should also sanction Chase by preventing it from supporting any of its defenses or opposing Plaintiffs' claims with the documents that it disclosed after the discovery cutoff, as required by Rule 37 and establish that:

    a. Chase made each oral and written statement identified in paragraphs 15-17 of the complaint and that those statements are defamatory *per se*;[6]

    b. Chase made the statements while knowing that Plaintiffs were not sanctioned or on any OFAC list;

    c. Chase intentionally instructed its agents to communicate to Plaintiffs' customers, vendors, and banks that transactions could not be completed "due to sanctions" by virtue of its policy requiring that language to be communicated for all cases that were cancelled just for compliance reasons and not because of sanctions.

The Court should also prohibit Chase from introducing any evidence to support its claims that the statements are not about Plaintiffs, and strike Chase's affirmative defenses of truth (first), privilege (second), and causation (sixth) all of which are supported by the late disclosed documents.

Plaintiffs' substantial prejudice is clear. Prior to the late deposition when Plaintiffs tried to mitigate their prejudice with a witness who had no personal knowledge of what Chase did to the Plaintiffs, Chase only produced two of fourteen versions of the Policy at issue. Plaintiffs have shown their prejudice even without the remaining version of the Policy. The Policy finally explains why Chase repeatedly told Plaintiffs' customers, vendors, and banks that it could not "execute transaction due to Sanctions and/or Internal JPMC Policy." Had Chase produced the Policy, Plaintiffs would have known what sort of documents to ask for, additional topics that it

---

[5] Plaintiffs do not believe that Chase's outside counsel is responsible for Chase's failures and, therefore, do not seek any relief against their attorneys or law firm.

[6] Plaintiffs will be seeking leave to amend their complaint to add the communications to numerous other customers and financial institutions. Those communications should also be established as defamatory *per se*.

would want to explore with Chase's witnesses who actually interacted with Plaintiffs' customers and banks, and would have better been able to properly value their claims before mediation. Instead, Chase waited until two months after the discovery cutoff and mediation to produce two versions of the Policy the evening before a deposition that the Court restricted to being about Chase's other late disclosed documents. Indeed, Chase should have disclosed the Policy in its initial disclosures. *Spano v. Satz*, 09-60255-CIV, 2010 WL 11515694, at *3 (S.D. Fla. Jan. 29, 2010) (Rosenbaum, J.) ("The purpose of initial disclosures under Rule 26(a) is to accelerate the exchange of basic information about the case and to facilitate early disclosure of types of information that have been customarily secured early in litigation through formal discovery.") (cleaned up). Chase should have also disclosed the Policy in response to Plaintiffs' specific request for production asking for the policies governing Chase's investigations.

Plaintiffs are also prejudiced by Chase's failure to disclose the documents that it sent on January 17 and January 27. Chase's counsel represented that Chase failed to produce the January 17 documents inadvertently and unintentionally. But the January 27 documents were produced only after it conducted "searches of yet more platforms" to "ensure that all records related to the newly-discovered documents were gathered and produced." Chase did these searches and produced the documents more than a month after the discovery cutoff. Though commendable, late searches for responsive documents does not come close to meeting Chase's discovery obligations to produce responsive documents when requested, let alone remove the prejudice from not having those documents during the entire discovery process.

The January 17 and 27 documents include internal discussions between Chase departments about communications—written and oral—to Plaintiffs' customers, vendors, and banks. Had Chase produced the documents timely, Plaintiffs would have been able to depose Chase's actual employees who made defamatory statements about Plaintiffs. Chase compounded Plaintiffs' prejudice when its representative did not interview or even speak to those representatives or review any documents that would have allowed him to answer Plaintiffs' questions. Chase's representative identified many documents—that still were not produced—that would allow him to answer Plaintiffs' questions.[7] Chase's untimely disclosure prevented

---

[7] *See QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 687–91 (S.D. Fla. 2012) (setting out the "*de facto* Bible governing corporate depositions" including that the purpose is to "avoid the bandying by corporations where individual officers or employees disclaim knowledge

Plaintiffs from trying to depose additional Chase witnesses knowledgeable about what was said to particular customers, vendors, or banks. This is especially important because Chase moved for summary judgment on Plaintiffs' slander claim saying, "Plaintiffs have not identified any oral statement that would serve as the basis for their slander claims." Mot. Summ. J. [DE 90] at 6 n.4. Chase also deprived Plaintiffs the opportunity to depose the bank's representatives that received Chase's defamatory statements about Plaintiffs. Chase cannot fail to disclose relevant documents until after the close of discovery and then not properly prepare their corporate representative to testify about oral communications that the documents show were made.[8]

At bottom, Chase failed to disclose central documents until a month or two months after the discovery cutoff. Chase did not look for many documents until after the discovery cutoff. Chase should have disclosed the Policy and these other documents with its initial disclosures. It didn't. Chase should have produced the Policy and these other documents when Plaintiffs requested it. Chase didn't. Chase should have disclosed the Policy and these documents before the discovery cutoff or at least before Plaintiffs finished deposing all the witnesses with any personal or first-hand information about the case. It didn't. Plaintiffs were prejudiced by being

---

of facts clearly known to the corporation," "to curb any temptation by the corporation to shunt a discovering party from 'pillar to post' by presenting deponents who each disclaim knowledge of facts known to someone in the corporation," and "a corporation has an affirmative duty to provide a witness who is able to provide binding answers on behalf of the corporation." Further, "[a]s a corollary to the corporation's duty to designate and prepare a witness, it must perform a reasonable inquiry for information that is reasonably available to it." And "[t]he rule implicitly requires the corporation to review all matters known or reasonable available to it in preparation for a Rule 30(b)(6) deposition.")

[8] Chase's representative testified that:

> Q. With respect to these subjects of inquiry, did you interview anybody at Chase to become knowledgeable about them?
> A. I didn't interview anyone within the bank, no.
> Q. Okay. Other than you attorney or Chase's attorney…did you discuss with anybody else these subjects of inquiry in any way?
> A. No.
> Q. Okay. And what documents did you review to prepare yourself to answer questions regarding subjects of inquiry?
> A. We reviewed some of the produced documents regarding the communication methods to the clients.

Corp. Rep. Depo. 7:20-8:9.

deprived an adequate opportunity to conduct discovery about the Policy and the other documents produced on January 17 and 27. The Court should thus sanction Chase.[9]

## CONCLUSION

The Court takes its case management and deadlines seriously.  While Plaintiffs waited and conferred in good faith for Chase to produce its responsive documents days before the discovery cutoff, and then Plaintiffs rushed to take the depositions of numerous fact witnesses, all along Chase had failed to find or produce records that would have totally changed the discovery landscape of the case.  There is no time or way to mitigate the prejudice to the Plaintiffs, or to maintain the integrity of the discovery process, other than the relief afforded under Rule 37 for such gross and ever-present discovery violations. *Woliner v. Sofronsky*, 2019 WL 125704, at *4 (S.D. Fla. Jan. 8, 2019) (a party's late disclosure severely prejudiced the other party and would "wreak havoc with the Court's dispositive motion deadline and trial date")

 Chase failed to disclose central documents that it would use to support its case. Chase failed to produce those documents when Plaintiffs requested them. Chase appears to not have looked for those central documents until more than two months after the discovery deadline. Chase "inadvertently" failed to disclose documents that included many additional defamatory statements. Chase then—well after the discovery cutoff—searched "yet more platforms" and found additional responsive documents. On every front, Chase failed in its discovery obligations causing Plaintiffs' severe prejudice. The only appropriate corrective action is to sanction Chase as set forth herein.

**WHEREFORE**, Plaintiffs, Monarch Air Group, LLC, and David Gitman, respectfully request that this Honorable Court enter an Order granting Plaintiffs Motion for Sanction, together with an award of reasonable attorney's fees and costs, and such other and further relief as this Honorable Court deems just and proper.

Certificate of Conferral: I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good-faith effort to resolve the issues but has yet been unable to resolve all the issues. Chase has agreed to

---

[9] Chase's counsel commendably has agreed to provide yet additional time, and to try and resolve the late disclosures. That bell cannot be unrung. Chase deprived Plaintiffs the ability to properly structure their discovery and case strategy. Only sanctions can fix Plaintiffs' prejudice.

some of the relief requested in this Motion but not in a way that will solve Plaintiffs' prejudice.

See 2/23/23 email from Mr. Weinberg, Exhibit C.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the CM/ECF filer on **February 24, 2023**, on all parties and counsel of record: Derek E. León, Esq., dleon@leoncogrove.com; Benjamin Weinberg, Esq., bweinberg@leoncosgrove.com, eperez@leoncosgrove.com; Sofia Manzo, Esq., smanzo@leoncosgrove.com, aquezada@leoncosgove.com; LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor Miami, Florida 33134.

Respectfully submitted,

STOK KON + BRAVERMAN
Attorneys for Plaintiffs
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: jkon@stoklaw.com
Secondary: service@stoklaw.com


/s/ Joshua R. Kon, Esq.____
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)

# TAB 115-1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

MONARCH AIR GROUP.LLC,　　　　**Case No.** 21-62429-CIV-DIMITROULEAS
d/b/a Mercury Jets, a Florida
limited liability company, and
DAVID GITMAN

　　　　Plaintiffs,

vs.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

　　　　Defendant.

_____/

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT

Plaintiffs, MONARCH AIR GROUP, LLC ("Monarch"), and DAVID GITMAN,

pursuant to Rule 34 of the Federal Rules of Civil Procedure, propounds its First

Request for Production to Defendant, JPMORGAN CHASE BANK, N.A ("Chase"),

which Defendant shall answer in accordance with the Federal Rules of Civil

Procedure.

## [CERTIFICATE OF SERVICE ON FOLLOWING PAGE]

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via E-mail on this 4th day of May, 2022, on all parties and counsel of record: LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor  Miami, Florida 33134, Derek E. León, Esq., dleon@leoncogrove.com; bweinberg@leoncosgrove.com; eperez@leoncosgrove.com; anoonan@leoncosgrove.com.

Respectfully submitted,

STOK KON + BRAVERMAN
Attorneys for Plaintiffs
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email:        rstok@stoklaw.com
Secondary: service@stoklaw.com

/s/ Joshua R. Kon, Esq.
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)
ALEX KAPLAN, ESQ.
Florida Bar No. 1030761
(akaplan@stoklaw.com)

## DEFINITIONS AND INSTRUCTIONS

As used herein, the words and phrases set out below shall have the meaning or meanings prescribed to them.

1. "Document" or "documents" shall mean every original (and every copy of any original or copy which differs in any way from any original) of every writing or recording of any kind or description, whether handwritten, typed, drawn, sketched, printed or recorded by any physical, mechanical, electronic or electrical means whatever, including without limitation, books, records, computer listings, computer printouts, computer programs, and tapes upon which information is stored, papers, pamphlets, brochures, circulars, advertisements, specifications, blueprints, maps, plats, surveys, drawings, sketches, graphs, charts, plans, laboratory or engineering reports, notebooks, worksheets, reports, lists, analyses, summaries, ledger accounts, audits, inventories, tax returns, financial statements, profit and loss statements, cash flow statements, annual or other periodic reports, prospectuses, registrations, correspondence, communications, telegrams, solicitations, minutes, stock ledgers, stock certificates, licenses, permits, calendars, appointment books, diaries, telephone bills and toll call records, expense reports, balance sheets, accountant's work papers, work sheets, commission statements, itineraries, agendas, payroll records, notes, memoranda including inter-office memoranda, checkbooks, canceled checks, receipts, contracts, agreements, instrument assignments, applications, offers, acceptances, proposals, financing statements, documents of title, appraisals, purchase orders, invoices, bills of lading, written memorials or oral communications, forecasts, photographs, photographic slides or negatives, films, filmstrips, tapes and recordings.

2.  The terms "you," "your," "yours," and "yourself" mean the Defendant, Chase, its agents, assignees, successors, employees, contractors, members, managers, officers, and unless privileged, its attorneys and accountants.

3.  "Defendant" shall refer to the Defendants in the caption above.

4.  "Plaintiff" shall refer to Plaintiffs in the above caption.

5.  "Related to" or "relating to"" shall mean directly or indirectly mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter within a particular request.

6.  All terms used herein shall have the same meaning and should be read *in para materia* with the definitions used or employed in the Amended Complaint.

7.  The singular shall include the plural and the plural shall include the singular.

8.  A masculine, feminine or neuter pronoun shall not exclude the other gender.

9.  If a request for production is silent as to the time span for which production is desired, production shall be made of all documents created since 2019.

10.  Each request shall extend to all documents which are or have been in the possession or subject to the control of you, your officers, agents or employees at any time during the period of time covered by this request.

11.  The term "and" shall include the term "or" and the term "or" shall include the term "and." The term "each" shall include the term "every" and the term "every" shall include the term "each." The term "any" shall include the term "all" and the term "all" shall include the term "any."

## <u>DOCUMENTS UPON WHICH PRIVILEGE IS CLAIMED</u>

For each document requested herein which is sought to be withheld under a claim of privilege, provide a privilege log in compliance with Local Rule 26.1(e)(2).

*Please read the Definitions and Instructions set forth above. These Requests for Production cannot be properly responded to without reference to and incorporation of same.*

### <u>Documents Requested</u>

**Request for Production No. 1**: All documents and communications created during the following JP Morgan Investigations identified by Chase' refernce numbers:

    a.  JPO210419-001071

    b.  JPO210316-001122

    c.  JPO210408-000453

**Request for Production No. 2**: Any records of communications to Chase customers about or relating to the investigations referenced in Request 1, including all customer service and security notes.

**Request for Production No. 3**: Any internal polcies, procedures, or manuals governing how Chase conducts investigations like the investigations identified in Request 1.

**Request for Production No. 4**: Any documents embodying or referencing a decision by Chase not to transfer money to accounts held by either or both of the Plaintiffs.

**Request for Production No. 5**: Any documents showing that Monarch is subject to OFAC sanctions.

**Request for Production No. 6**: Any documents showing that David Gitman is subject to OFAC sanctions.

**Request for Production No. 7**: Any documents showing that anyone related to Monarch is subject to OFAC sanctions.

**Request for Production No. 8**: All documents and communications relating to the following transactions:

   a.  5285128878

   b.  5277065595

   c.  5270080872

   d.  6504194098FS

   e.  5285710817

   f.  5273977360

   g.  5289194486

**Request for Production No. 9**: Any records of communications to Chase customers about or relating to the investigations referenced in Request 8, including all customer service and security notes.

**Request for Production No. 10**: All communications between Chase and Fidelity Investments relating to Chase's refusal to permit wire transfers to Plaintiffs.

**Request for Production No. 11**: All communications between Chase and any third party regarding Monarch or David Gitman, referencing sanctions, OFAC sanctions, and Internal JPMC Policy.

**Request for Production No. 12**: All communications and records of communication between Chase and any of its customers relating to the cancellation of transfers or refusal to transfer money to Monarch or David Gitman.

**Request for Production No. 13**: All communications and records of communication between Chase and any banks relating to the cancellation of transfers or refusal to transfer money to Monarch or David Gitman.

**Request for Production No. 14**: All documents identified in any response to Plaintiff's Interrogatories.

**Request for Production No. 15**: All internal Chase communications regarding any decisions not to permit money to be transferred to Monarch or David Gitman using Chase infrastructure.

**Request for Production No. 16**: All internal Chase communications regarding any decisions to close Monarch's and David Gitman's accounts with Chase.

**Request for Production No. 17**: All account creation documents for Monarch and David Gitman.

**Request for Production No. 18**: All account profiles and Know Your Customer profiles created or compiled for Monarch or David Gitman.

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the CM/ECF filer on **June 27, 2024**, on all parties and counsel of record: Derek E. León, Esq., dleon@leoncogrove.com; Benjamin Weinberg, Esq., bweinberg@leoncosgrove.com, eperez@leoncosgrove.com; Sofia Manzo, Esq., smanzo@leoncosgrove.com, aquezada@leoncosgove.com; LEÓN COSGROVE, LLP 255 Alhambra Circle, 8th Floor Miami, Florida 33134.

Respectfully submitted,

STOK KON + BRAVERMAN
*Counsel for Appellants*
1 E. Broward Boulevard
Suite 915
Fort Lauderdale, FL 33301
P.954.237.1777
F.954.237.1737

*/s/ Joshua R. Kon*
ROBERT A. STOK, ESQ.
Florida Bar No. 857051
rstok@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com